In the Matter of the Estate of MAY EUNICE SCULLIN DE GHEEST, Deceased, ALEXANDRE SCHAPOSCHNIKOFF, Claimant, Respondent, v. Estate of MAY EUNICE SCULLIN DE GHEEST, Deceased, MERCAN-TILE-COMMERCE BANK & TRUST COMPANY, Executor, Appellant, No. 42147—243 S. W. (2d) 83.

Division Two, October 8, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, November 12, 1951.

*Samuel A. Mitchell, James M. Douglas, Harold I. Elbert* and *Charles M. Spence* for appellant; *Thompson, Mitchell, Thompson & Douglas* of counsel.

636

*Jacob M. Lashly, John H. Lashly* and *Lashly, Lashly & Miller* for respondent.

637

BARRETT, C.—On February 5, 1946 Alexandre Schaposchnikoff, a French citizen, filed a demand against the estate of May Scullin De Gheest in the Probate Court of the City of St. Louis. The Probate Court allowed the claim and upon appeal and trial in the Circuit Court judgment was entered for the sum claimed, $28,000, together with six per cent interest from January 1, 1946. Mrs. De Gheest's executor, the Mercantile-Commerce Bank and Trust Company, appeals from the $35,216.80 final judgment.

Since the claim originated in the Probate Court there were no formal pleadings. Mr. Schaposchnikoff's notice of demand states that his claim is "founded on account for money had and received by decedent from claimant. A copy of said account is attached hereto and made a part hereof." The notice then sets forth the following document, "a reconnaissance de dette," dated April 21, 1943, signed by Mrs. De Gheest in Paris and witnessed by her American lawyer, Mr. John B. Robinson:

"KNOW ALL MEN BY THESE PRESENTS: THAT, WHEREAS the undersigned May Eunice SCULLIN widow of Charles de GHEEST, deceased, a citizen of the United States of America, born at Montreal, Canada, on July 12th, 1864, holder of United States passport number 4.364, residing at No: 37 rue

Leperouse at Paris, XVIth arrondissement (France), is indebted to Mr. Alexandre SCHAPOSCHNIKOFF, residing at Paris, 9 Rue d'Artois, eighth arrondissement, in the sum of TWENTY EIGHT THOUSAND DOLLARS ($28,000.00), lawful money of the United States of America, for monies advanced by him to her prior to the date of these presents, and

"WHEREAS, said May Eunice SCULLIN DE GHEEST has been unable to reimburse said sum owing to the blocking of funds belonging to her, situated in the United States of America, in the hands of the Mercantile and Commerce Bank and Trust Company, of Saint Louis, Missouri.

"NOW THEREFORE, In consideration of the premises and with a view to repayment of said sum advanced by the said Alexandre SCHAPOSCHNIKOFF, the said May Eunice SCULLIN DE GHEEST, hereby does assign, transfer and set over unto said Alexandre SCHAPOSCHNIKOFF, the sum of TWENTY EIGHT THOUSAND DOLLARS ($28,000.00) of all funds, securities, and credits belonging to her in the possession of the Mercantile and Commerce Bank and Trust Company, of Saint Louis, income and/or principal; said sum to be paid or transferred to the account of said Alexandre Schaposchnikoff, as soon as possible, and should said sum not be so paid or transferred prior to January 1, 1946, the undersigned does assign transfer and set over to said Alexandre Schaposchnikoff from said funds, securities and credits, a further sum equivalent in amount to interest at the rate of six per cent (6%) per annum upon said $28,000, (twenty eight thousand dollars), to run from January 1st 1946 to the date of such payment or transfer to the account of said Alexandre Schaposchnikoff, and she does hereby appoint said Alexandre Schaposchnikoff her irrevocable attorney in fact with power of substitution, to receive and receipt for said sum of twenty eight thousand dollars ($28,000) from said Mercantile and Commerce Bank and Trust Company of St. Louis."

█ Even though the pleadings were informal, the notice of demand and the attached "account" state a claim for money had and received, or, more appropriately, for restitution. Restatement, Restitution, p. 6; Miners Bank v. Burress, 164 Mo. App. 690, 147 S. W. 1110; Bank of Commerce v. Ruffin, 190 Mo. App. 124, 175 S. W. 303; In re Hukreda's Estate, (Mo.) 172 S. W. (2) 824. The written instrument evidencing the debt is obviously an assignment but as was said in another action for money loaned, "the payee may, unless the note has been taken as payment of the debt, at his election, either sue the maker on the note, in which event the note itself makes out a prima facie case for plaintiff, or waive the cause of action on the note and sue the maker in indebitatus assumpsit for money loaned,

producing the note as evidence of the loan agreement and for cancellation." Reifeiss v. Barnes, (Mo. App.) 192 S. W. (2) 427, 430. We note this in passing for the reason that in some of the presidential "freezing" order cases (56 Har. L. R. 30: "Exchange Control, Freezing Orders And The Conflict Of Laws" Freutel),—the cases of refugees who have purchased tickets from steamship companies with blocked marks entitling them to passage from some European port to New York, and have had their passage cancelled because of war,—some of the courts have emphasized, against the defense that the claimant is entitled only to blocked marks, that the action is in fact one for restitution rather than one for damages and, therefore, the place of performance of the contract, Germany, was no obstacle since the courts were not enforcing the terms of the contract. Rosenblueth v. N. V. N. A. S. M., 27 N. Y. S. (2) 922; Bleiweiss v. Cunard White Star Ltd., 34 N. Y. S. (2) 172. The courts have also found some way of avoiding the extraterritorial effect of the Soviet and German anti-racial monetary decrees. 88 Pa. L. R. 983. The assignment involved here recites that "WHEREAS, said May Eunice SCULLIN DE GHEEST has been unable to ▮▮▮ reimburse said sum owing to the blocking of funds belonging to her, situated in the United States of America, * * *."

▮▮▮ The executor seizes upon the fact that this is an action for money had and received and not one to enforce performance of an obligation undertaken to be made in Missouri and insists that the entire transaction was consummated in France and therefore the essential validity of the claim is to be determined and governed by the law of France. It is in this connection that the executor contends that the court erred in excluding evidence that the transaction on which the claim was founded was illegal under the law of France. The executor offered to prove by a qualified expert, an American citizen and lawyer with distinguished associates in New York but formerly a French educated lawyer, that he had made a particular study of currency and monetary exchange controls, of French statutes, decrees and court decisions enacted and in force "immediately prior to or early during the last war as a means of protecting French economy in times of emergency, that they continued to be in effect during the war and continued to be administered by French officials," and that in his opinion the transaction between Mrs. De Gheest and Mr. Schaposchnikoff was illegal and void at the time under the law of France. We lay to one side any questions as to the sufficiency and adequacy of the offer of proof and accept the appeal upon the executor's assertion that so much of the transaction as in fact occurred in France was illegal under French law, but before determining the executor's claim that the entire transaction did in fact occur in France and that the essential validity of the transaction is governed by the law of France rather than the law of Missouri it is necessary

to consider and examine the circumstances in which the money was loaned and the assignment executed.

The instrument was drafted in the Paris office of Coudert Brothers by Mr. John B. Robinson, an American lawyer who had practiced law in Paris for forty-eight years. He was casually acquainted with Mrs. De Gheest. He had prepared a will for her in 1942. He obtained the information set forth in the instrument from Mrs. De Gheest's son, Henry, who, incidentally, predeceased her. The reason he advised this transaction was that 1942, 1943 and 1944 were the years of the German occupation of France and there was a German decree and a French decree prohibiting exchange operations in foreign currency. Neither Mr. Robinson nor Mrs. De Gheest were interned because they were both past sixty-five, although a "German administrator," who seldom came in, was assigned to Mr. Robinson's office and monthly checked his receipts and disbursements. He was not a French lawyer and did not know whether the transaction was illegal, in the sense of being absolutely void, under French law. Mr. Robinson did not witness the exchange of money between Mrs. De Gheest and Mr. Schaposchnikoff but he said, "I advised this transaction with a view to helping Mrs. De Gheest to obtain funds: She could receive no remittances from America, she was an old lady, (she was eighty-one when she died) and I understood from her son that she needed the money, and I saw no other way of getting it." He said that at the time he drafted the instrument Mr. Schaposchnikoff surrendered to him a similar document, which he had not drafted, assigning $15,000 and that he destroyed it by tearing off the signatures. Of the instrument in general he said, "This was an assignment of dollars in consideration of French francs, and for that reason I did not speak of French francs in the drafts I drew." He explained to the parties that he had been unable to communicate with the United States for some time and that he did not know what laws or regulations had been passed in his own country which might affect the transaction. It was his opinion, however, that the transaction was "an assignment of dollars out of property in America, enforceable under American law." He said, "I consider them (the assignments, the original and a duplicate) binding as between the parties."

Mr. Schaposchnikoff's version of the transaction is contained in a written statement which the parties have stipulated as a part of the record. He said that in the latter part of 1942 Mr. Henry De Gheest came to him and stated that his mother was in dire need of funds in addition to the $500 a month she could receive from the United States. Henry said that she was awaiting a large sum of money which would come to her by way of Switzerland and he asked Mr. Schaposchnikoff for an advance against the expected money. Mr. Schaposchnikoff called upon Mrs. De Gheest at her residence and delivered her 150,000 francs. The expected money did not arrive and Mrs. De

Gheest asked for an additional advance of 600,000 francs. Mr. Schaposchnikoff said that this was a large and important sum of money and he would not advance it until he had consulted her American lawyer and confirmed the fact that she was "extremely well known in America and very rich." He then sought advice on the way in which the loan should be made "in order that I would be reimbursed automatically after the war," and, after being advised, gave Mrs. De Gheest 600,000 additional francs, then valued at the rate of fifty francs to the dollar. It was at this point that the $15,000 "reconnaissance de dette" was executed. Some months later Henry De Gheest telephoned and said that his mother was again in need of money "as life under the German occupation was very dear." He said, "I went to see Mrs. De Gheest and told her that I had at my disposal no more liquid funds but that I could give her a diamond of 3 carats which belonged to me and which she could sell. I left with her this diamond so that she could have the same valued and, a few days later, she told me that she was in agreement to pay me for the same the equivalent of Fcs. 625.00, i.e. $12,500." In the meantime he had given her 25,000 francs or $500. The $28,000 instrument covering all the advances was then executed.

It is in these circumstances that the executor contends that the entire transaction occurred in France and therefore its essential validity is to be tested and governed by French law. The respondent concedes, in fact proved, the circumstances, but urges that they "bear their own proof" that it was the manifest intention of the parties that the agreement was to be performed in the United States and is governed by the law of Missouri. It is true, as the executor urges, that the Missouri courts have often quoted the statement from Scudder v. Union National Bank, 91 U.S. 406, 23 L. Ed. 245, "Matters bearing upon the execution, the interpretation, and the validity of a contract are determined by the law of the place where the contract is made." State ex rel. Winkle v. U. S. F. & G. Co., 322 Mo. 121, 135, 14 S. W. (2) 576; Ruhe v. Buck, 124 Mo. 178, 183, 27 S. W. 412. In the Winkle case the state of Kansas was a party to the action and sought to enforce the obligation of a surety on a general contractor's bond for material used in the administration building at Kansas University. Our courts have also said that "the law of the state or country in which a contract is made or entered into governs the contract, its nature, validity, obligation, interpretation, and legal effect" (Kelsall v. Riss, (Mo. App.) 165 S. W. (2) 329) or they have said in insurance cases, even when the policy stipulated that it was to be governed by the law of a specified state, that "matters bearing upon the execution, the interpretation, and the validity of the contract, are determined by the law of the place where the contract is made." Gray v. Metropolitan Life Ins. Co., (Mo. App.) 150 S. W. (2) 563, 564. The leading case holding that an insurance policy was governed by the law of

Missouri rather than by the law of New York, principally because of the state's expressed statutory policy, is Cravens v. New York Life Ins. Co., 148 Mo. 583, 50 S. W. 519. But the Missouri courts have not always been so explicit and categorical in connection with these statements. Illinois Fuel Co. v. M. & O. R. Co., 319 Mo. 899, 8 S. W. (2) 834. In most of the cases in which the statement is announced as a rule or principle the contracts were made and to be performed in the same state.

Mr. Schaposchnikoff's counsel insists, when the contract is made in one state or country and it is the manifest intention of the parties that it is to be performed in ▮▮▮ another state or country, that the law of the place of performance, here Missouri, is determinative of the transaction. In this connection counsel quotes from the Missouri cases which have said, "The law of the place where the contract is to be performed is the law of the contract." Smoot v. Judd, 161 Mo. 673, 684, 61 S. W. 854; Davis, McDonald & Davis v. Tandy, 107 Mo. App. 437, 81 S. W. 457; Odell & Frink v. Gray & Co., 15 Mo. 337. Or, "The laws of the state where the note was made payable, and by which the parties intended its validity and enforceability should govern, is controlling in this proceeding." Vennum v. Mertens, 119 Mo. App. 461, 464, 95 S. W. 292. And sometimes, when the contract was made in one state, partly to be performed in that state and partly to be performed in another state, in the absence of any other circumstances indicating the intent of the parties, the court has said, "Here, we have an order or draft issued in Nebraska, directing a bank in Missouri holding its funds and notes, to pay certain amounts to the holders of the drafts. Can it be said that the performance of the contract did not have its situs in Missouri where the funds were? We think not." Carson National Bank v. American Nat. Bank, 225 Mo. App. 948, 955, 34 S. W. (2) 143.

The executor points to the fact that all the cases upon which the respondent relies are distinguishable upon their facts from the facts of this case, that some of the decisions did not in point of fact involve the rules and doctrines concerning conflict of laws. The executor says that the Carson National Bank case is merely authority for the proposition that the law of the place of payment of a check or draft determines whether they constitute an assignment of the debt owed by the bank to the drawer, and in any event should be a "forceful reminder of the dangers which lie in failing to distinguish between questions of inherent validity and questions of remedy and performance." Nevertheless, the fact remains that several Missouri cases have applied the rule that the law of the place of performance governs; and the rule has been the determinative factor in a variety of transactions. It could be pointed out that the cases upon which the executor relies are also distinguishable upon their facts and that the Missouri courts have not always been consistent or scrupulously care-

ful of the precise issue involved in applying the rule that the validity of a contract or other transaction is determined by the law of the place of making. The fact of the matter is "The Missouri decisions are not entirely harmonious and it is not easy to deduce any satisfactory conclusion as to whether this State is committed to a definite rule." Bour & Parks, "Missouri Annotations To The Restatement Of The Law Of Conflict Of Laws," p. 140. It would serve no useful purpose to attempt an analysis and reconciliation of the Missouri cases, they are all cited and classified in the annotation and their conflict is merely typical of the general conflict existing in the other jurisdictions. See also 2 Beale, Conflict Of Laws, Sec. 332.33, for a discussion of the Missouri cases.

Likewise, it would serve no useful purpose to attempt a discussion of the cases from other jurisdictions. The cases are all collected, analyzed and criticized in the leading treatises and law review articles. It is in these books and articles by the distinguished specialists in the field that the philosophy and reasons of the various doctrines concerning conflict of laws have been thoroughly examined as in no other field of the law. And despite the executor's insistence that the rule (that the law of the place of contracting governs as to the essential validity of contracts) is gaining strength and support, these noted specialists are also in irreconcilable conflict as to what the applicable rules are or should be. It is not necessary to examine the various theories, it is sufficient to note that as to the validity of contracts the three theories enunciated by the various courts and supported by the various specialists are: (1) that the law of the place of making governs; (2) that the law of the place of performance governs, and (3) that the law intended by the parties governs. And, as has been noted, sometimes the courts apply a combination of these rules and ▮▮▮▮ theories. It would unduly prolong this opinion to set forth the philosophy of the various theories and examine all the arguments that have been advanced in favor of one theory or against another, and therefore, a selected list of the most distinguished modern advocates of the various theories is submitted.

Professors Beale and Goodrich are the principal advocates of the place of making rule and their views have been written into the American Law Institute's "Restatement Of The Conflict Of Laws." Restatement, Conflict Of Laws, Sec. 332. They are also the principal critics of all other theories. 2 Beale, Conflict Of Laws, Sec. 332.4; Goodrich, Conflict Of Laws, Sec. 110. Their views have not only been questioned but even the advisability of the American Law Institute's selection of conflict of laws as a subject for early restatement has been questioned. Lorenzen & Heilman, "The Restatement Of The Conflict Of Laws," 83 Pa. L. R. 555. In criticizing the place of contracting theory, it has been urged that the American cases "stand out for simplicity and practical-mindedness," that "Their flexibility

is in accord with the spirit of the universal intent doctrine as well as with the nature and infinite variety of contracts," permitting the courts "to discover and apply the law of the place to which the most important contacts of the contract go." Nussbaum "Conflict Theories Of Contracts; Cases Versus Restatement," 51 Yale L. J., p. 893. Professor Lorenzen is the principal exponent, in certain circumstances, of the intention of the parties theory. In part, he concludes that the rules should be: "(1) The effects of contracts are governed by the law of any state chosen by the parties. (2) If the intention of the parties is not expressed, the effects of the contracts shall be governed by the law of the specified place of performance. (3) If the intention of the parties does not appear and no place of performance is specified the law of the place of contracting shall control." Lorenzen, "Validity And Effects Of Contracts In The Conflict Of Laws" 30 Yale L. J., pp. 565, 655; 31 Yale L. J. 53. Professor Cook has been a searching critic of the place of contracting theory (31 Ill. L. R. 143) and an advocate of the intention of the parties theory, especially when their intention is expressed. He also says that "there is no substantial reason why a state with which the transaction has a sufficient number of points of contact should not give effect to it even though by the 'law' (conflict-of-laws rule) of the 'place of contracting' it is legally ineffective." Another of his conclusions is that "The 'conflict-of-laws' problems in the field of 'contracts' need to be broken down so that different types of social, economic and business problems may receive separate consideration. No attempt should be made to state a single comprehensive rule or brief set of rules, to be applied more or less mechanically to all types of contracts." Cook "Contracts And The Conflict Of Laws," 32 Ill. L. R. 899.

This unique transaction and the force of the circumstances in which the parties dealt with one another certainly compel that separate consideration, despite the appellant's contention, which we make no attempt to resolve, that "the law and morals often differ." In contending for the law of the place of making rule Professor Beale stated the argument more specifically: "If two parties agree between themselves to do a thing, their agreement does not and cannot create any binding obligation to do it. The obligation created by the promise is merely a moral and social one, with which the law has nothing to do. It is only when the law affixes to the promise a legal obligation of performance that the parties can be said to have entered into a contract in a true sense." 2 Beale, Conflict Of Laws, Sec. 332.4, p. 1090. In this connection the executor says that Mr. Schaposchnikoff was an experienced money-lender and entered into this agreement knowing full well its inherent risks and that for reasons good to him deemed it advisable "to obtain dollar credits in this country at a time before our forces had landed in Normandy." It is urged that he could have contracted for a return of francs rather than dollars.

It is pointed out that he gave francs at the rate of fifty to the dollar when the exchange rate was then ██ 150 francs to the dollar. And finally it is argued that he violated the fundamental law of his country, laws and decrees "enacted or adopted either immediately prior to or early during the last war, as a means of protecting French economy in times of emergency."

We have accepted the executor's offer of proof as to French law but it does not precisely appear from the offer just what French law the witness was talking about. If this argument is to be considered, it is indeed well known that the German armies occupied Paris on June 14, 1940 and that in the days of this transaction either the Vichy government or the occupying German forces controlled France, including its "laws and decrees." That argument would necessarily demand more accurate information concerning the applicable law of France and a determination of whether it was contrary to the public policy of the United States and of Missouri. Restatement, Conflict Of Laws, Sec. 612; King of Prussia v. Kuepper's Adm., 22 Mo. 550. It is not claimed that this was a gambling transaction (Robinson v. Bland, (1760) 2 Burr. 1077, the English case from which a large part of the conflict has emanated) and it is not contrary to our public policy. The transaction involves personal rights between private persons and the executor tacitly concedes that the transaction is valid and enforceable under Missouri law. Mr. Schaposchnikoff may have been aware of the "inherent risks" involved and for "reasons good to him" may have accepted them but it does not appear just what the real penalty to him would have been had the existing government discovered and examined the transaction. It stands undisputed that he advanced the francs or their equivalent in value to Mrs. De Gheest, and that no part of the advances have been repaid. Undoubtedly, "life under the German occupation was very dear" and the exigencies of Mrs. De Gheest's needs or the urgency of her son's needs are not known. Neither public policy nor morals militate against the validity of his claim.

But aside from these considerations the executor contends that the entire transaction, including performance, took place in France and is therefore governed by the law of France. It is urged that both parties resided in France, that the transaction involved an exchange of francs for an assignment of dollars and that the bargain was completely performed when she executed and delivered the assignment. In this connection it is argued that the claim is in fact an action for money had and received or for breach of the warranty implied in the assignment and not an action "to enforce a performance undertaken to be made in Missouri." But regardless of the precise nature of the action, the claim involves the recited fact that Mrs. De Gheest is "*indebted* to Mr. Alexandre Schaposchnikoff, * * * in the sum of $28,000.00 * * * *for monies advanced by him to her*," which she

"has been unable to reimburse" because of the blocking of her funds in the United States. The assignment was executed "with a view to repayment of the sum advanced." Certainly there can be no magic in any technical name applicable to the transaction between Mrs. De Gheest and Mr. Schaposchnikoff. There were several elements or stages in the transaction, Mrs. De Gheest's applications for "advances" of francs, Mr. Schaposchnikoff's delivery of francs to her and her execution of the assignment which even the executor concedes "is, at most, evidence of indebtedness." In short, the essence of the transaction is that it was a *loan*, and the executor's argument overlooks the fact that there are two sides to a loan transaction, a temporary delivery or "advances" on one side and a repayment on the other. 54 C. J. S., pp. 656-657. A "loan" is "the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use; and if such be the intent of the parties the transaction will be deemed a loan regardless of its form." Batchelor v. Mandigo, 95 Cal. A. (2) 816, 213 P. (2) 762, 764; In re Grand Union Co., 219 Fed. 353, 356.

No doubt, as the executor points out, in the normal course of events, had Mrs. De Gheest lived and had the assignment ▮▮▮ been honored the loan would have been repaid through the usual commercial channels, probably through a transfer of credits, the last one to Mr. Schaposchnikoff in Paris. But Mrs. De Gheest died and the assignment has not been honored and the loan has not been paid either here or in France. Nevertheless, the parties contemplated in any and all events a transfer of the agreed dollars in consideration of the advanced francs. It is true that the parties were then residents of France but Mrs. De Gheest was "a citizen of the United States of America," a holder of a United States passport. They contracted in part with reference to her funds in the Mercantile Commerce Bank and Trust Company in St. Louis. They sought the advice of an American lawyer, her lawyer, and he considered the agreement "binding as between the parties" and "enforceable under American law" and so advised them. It is unnecessary to again recite the facts and further analyze them. Important elements of the transaction had their situs in France, but as events have transpired important elements of the transaction have their situs in Missouri. J. I. Case Threshing Mach. Co. v. Tomlin, 174 Mo. App. 512, 518, 161 S. W. 286; Carson National Bank v. American Nat. Bank, supra. When all the circumstances are taken into consideration, the situation of the parties at the time, the exigencies of their needs, the force of the setting and background, the essential nature of the transaction and the facts as they now present themselves Missouri has necessarily come to be the place of performance, and it does but little violence to any settled rules or doctrines concerning conflict of laws to say that the essential validity of this transaction

is governed by the law of Missouri and that Mrs. De Gheest's estate is justly indebted to Mr. Schaposchnikoff, as the trial court has found. Holland Furnace Co. v. Connelley, 48 F. Supp. 543; Smoot v. Judd, supra; Vennum v. Mertens, supra; Cook, "Contracts And The Conflict Of Laws," supra; David v. Veitscher Magnesitwerke Actien Gesellschaft, 348 Pa. 335, 35 Atl. (2) 346.

Even so the executor insists that "at most claimant would be entitled to recover only what he gave the decedent for the assignment and the record does not show what that was." It is contended that the evidence does not show any definite amount paid by claimant to decedent, but whatever he paid her was in French francs and not in American dollars. In short, it is the executor's contention that claimant's recovery must be restricted to the amount of francs Mrs. De Gheest received, plus interest, and since our courts may not enter a judgment for francs that the francs must be translated into dollars. The supplemental transcript, Mr. Schaposchnikoff's statement, shows exactly what he gave her and what we have said as to the nature of the transaction indicates the validity of the consideration. 54 C. J. S. p. 657. For the most part the executor's argument in this respect is based upon the basic claim that the debtor's obligation is governed by the law of the foreign country. Mr. Justice Holmes carefully pointed out in Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U. S. 516, 47 S. Ct. 166, 71 L. Ed. 383, that the obligation involved there "was and continued to be a liability in marks alone and was open to satisfaction by the payment of that number of marks * * *. An obligation in terms of the currency of a country takes the risk of currency fluctuations and whether creditor or debtor profits by the change the law takes no account of it. * * * If the debt had been due here and the value of dollars had dropped before suit was brought the plaintiff could recover no more dollars on that account." This loan transaction was not to be discharged in foreign money (Liebeskind v. Mexican L. & P. Co., 116 F. (2) 971), the obligation involved here is a liability in stipulated dollars and that is what the claimant is entitled to recover. 70 C. J. S., Secs. 15, 20, pp. 221, 226; Marine Ins. Co. v. McLanahan, 290 Fed. 685.

Accordingly the judgment is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.