THE STATE OF KANSAS at Relation and to Use of WINKLE TERRA COTTA COMPANY, Appellant, v. UNITED STATES FIDELITY & GUARANTY COMPANY.—14 S. W. (2d) 576.

Division Two, March 2, 1929.

*Harry E. Sprague* and *Franklin Miller* for appellant.

124

*Eugene S. Quinton* and *Casper S. Yost, Jr.,* for respondents.

HIGBEE, C.—The statement made by appellant's counsel reads,:

"This is a suit against the surety on a general contractor's bond for an unpaid balance for terra cotta used in one of the buildings at the Kansas University. At the conclusion of the case the court gave a peremptory instruction for defendant, and the relator (suit having been brought in the name of the State of Kansas as obligee in the bond to the use of the Winkle Terra Cotta Company, which had furnished the terra cotta) took a nonsuit with leave to move to set same aside. The motion to that end being overruled, this appeal is prosecuted.

"The abstract is extremely long because of the many lengthy contracts which are set out in full, and this statement is intended to be an impartial condensation of the record.

"The facts are simple. On November 2, 1917, the State of Kansas let a contract to the Olson & Johnson Company (which later on changed its name to the Olson-Magee Company) to build an addition to its administration building and college of liberal arts at the University of Kansas, located at Lawrence, Kansas. The contract, which is in evidence, was for $195,125. The Olson & Johnson Company let the contract for the terra cotta in the building to the Winkle Terra Cotta Company, the relator herein, for $53,130, including an ornamental panel which was not used and carried an allowance of $1,580 from the contract price. Other terra cotta valued at $110 was substituted for the unused panel, making the actual contract $51,660. Relator performed its contract, but has received only $19,402.69 of the contract price, leaving a balance of $32,257.31 owing, which is the amount sued for herein.

"At the time of said contracts Kansas had two statutes (Secs. 7569 and 7570 of the General Statutes of Kansas, 1915, now Secs. 60-1413 and 60-1414, R. S. 1923) reading as follows:

"Sec. 7569, now Sec. 60-1413: That whenever any public officer shall, under the laws of the state, enter into contract in any sum exceeding $100, with any person or persons, for the purpose of making any public improvements, or constructing any public building or making repairs on same, such officer shall take from the party con-

tracted with a bond with good and sufficient sureties to the State of Kansas, in a sum not less than the sum total in the contract, conditioned that such contractor or contractors shall pay all indebtedness incurred for labor or material furnished in the construction of said public building or in making said public improvements.

"Sec. 7570, now Sec. 60-1414: That such bond shall be subject to the approval of the clerk of the district court of the county in which such public improvements is to be made or such public building is to be erected and shall be filed in the office of said clerk. When such bond is so approved and filed, no lien shall attach under this article, and if when such bond is filed, liens have already been filed, such liens shall be discharged. Any person to whom there is due any sum for labor or material furnished, as stated in the preceding section, or his assigns, may bring an action on such bond for the recovery of such indebtedness: *Provided*, That no action shall be brought on said bond after six months from the completion of said public improvements or public buildings.

"Pursuant to those statutes the Olson & Johnson Company furnished a bond to the State with defendant as surety in the sum of its contract, which bond was duly approved and filed in the office of the clerk of the district court, and is the bond herein sued on.

"The main work on the building began the latter part of 1917, and ran substantially through 1918; monthly payments were made upon the State Architect's estimates of ninety per cent of the estimated amount of work for the preceding month. Including December, 1918, there had been paid in this manner all but $23,823.35 of the contract price. At that time the State Architect had refused to accept certain of the floors and woodwork in the building, and final payment of the above balance was withheld. This led to negotiations between the State Architect and the State's Business Manager (having charge of such matters for the State by statutes in evidence) and Olson or other representatives of the Olson-Magee Company, during which negotiations it was agreed that if the surety on the bond, defendants herein, would consent, the Olson-Magee Company would leave $2500 of the above balance on deposit (which it was estimated would cover the cost of replacing the objectionable floors and woodwork) and the State would make payment of the final $23,823.35 on the contract.

"To the above end an extensive interchange of letters and telegrams took place between the State's Business Manager and the home office of defendant in Baltimore, Maryland. These include in particular a telegram and two letters reading as follows:

Baltimore Md 13                                    1919 Jan 13 PM 10 05
Mr. James A. Kimball
    Business Mgr Topeka Kansas
    We as surety consent to the final payment on account of the contract
between Olson & Johnson Company and the State of Kansas by the State
Board of Administration through its Business Manager for the erection
and completion of a portion of the Administration Building and College
of Liberal Arts at Kansas University Lawrence Kansas and agree to
remain liable to the same extent as if this consent had not been given.
                    United States Fidelity and Guaranty Company.


                              LETTER.

                              Baltimore, Md., January 14, 1919.
Mr. James A. Kimball,
    Business Manager,
        Topeka, Kansas.
Dear Sir: —      Bond #269821/2-17, Olson & Johnson Co.
    Upon the receipt yesterday of a letter from Mr. Allen J. Olson, the
president of the Olson-Magee Company, successors to the Olson & John-
son Company, in regard to the contract covered by our above numbered
bond, we sent you a night letter, as per inclosed confirmation, to the
effect that we, as surety, consent to the final payment on account of the
contract between the Olson & Johnson Company and the State of Kansas,
by the State Board of Administration through its Business Manager, for
the erection and completion of a portion of the Administration Building,
and College of Liberal Arts at Kansas University, Lawrence, Kansas,
and agree to remain liable to the same extent as if this contract had
not been given. We understand that the Olson & Johnson Company will
give a certified check for $2,500.00
                              Yours very truly,
                                    Sidney Hall,
                                    Vice-President.


                              LETTER.

                              Baltimore, Md., January 20, 1919.
Board of Administration, State of Kansas,
    Mr. James A. Kimball, Business Manager,
        Topeka, Kansas.
Dear Sir:—
    Re Bond #269821/2-17, Olson & Johnson Co.
    I am extremely sorry that there should be any misunderstanding as to
the meaning of our telegram of January 13th. The telegram was in-
tended to give our consent at this time to the making of the final payment
and to agree to remain liable to the same extent as if the payment had
not been made and we had not given our consent. We further consent to
the acceptance by the Board of Administration of the Certified Check
for $2,500.00 and agree that the acceptance of that check shall not in
any way relieve the Surety Company from any of its obligations.
Hoping that this is satisfactory, I am,
                              Yours very truly,
                                    Sidney Hall,
                                    Vice-President.

"Upon receipt of these advices the State made final payment upon the above basis, and the Olson-Magee Company deposited with the State a certified check for $2500, which was agreed to be retained to replace the floors and woodwork. The State Architect issued a so-called final estimate for the $23,823.35 balance, which is in evidence. The $2500 deposit was still retained by the State for the above purpose at the time of the trial. During July and August, 1919, the Olson-Magee Company attempted to replace the work complained of in the building, bought material and had it shipped to the job, and had its workmen there working, but its efforts were unavailing and the work never was accepted.

"There were also in force in Kansas statutes declaratory of the management of the state's institutions, including Kansas University, as follows:

" 'Section 1. A board to manage the state institutions is hereby created, consisting of four electors, three of whom shall be appointed by the Governor, who shall be chosen without reference to party politics and because of their fitness for the duties of the office, by and with the advice and consent of the Senate. The Governor, by virtue of his office, shall be a member of said board and be the chairman thereof. The board shall be known and called the Board of Administration.

" 'Section 8. The board shall employ and appoint a business manager for all the institutions covered by this act, who shall have been a bona-fide resident of the State of Kansas for more than one year prior to his appointment, at a salary to be fixed by the board.

" 'Section 9. . . . All improvements authorized by the Legislature shall be constructed under estimates, plans and specifications furnished to the State Board of Administration by the State Architect, and it is hereby made the State Architect's duty, on the direction of the State Board of Administration, to inspect and have knowledge of the condition of all buildings and property used for the educational, benevolent, penal and corrective institutions of the State of Kansas, and make report to the business manager of any repairs, alterations or improvements needed or required, and perform such other duties as shall be prescribed by said Board of Administration. The business manager, under the direction of the Board of Administration, shall have full charge of the erection of all buildings, grounds or properties of the various institutions under their charge, and for which appropriations have been or may be made by the Legislature. Such manager shall call to his assistance the State Architect, who shall prepare all plans and specifications and estimates either for new buildings, repairs, improvements or replacements and submit the same to the business manager for approval.'

"The contract between the State and the Olson & Johnson Company provided:

" 'That no payment shall be made except on the certificate of the State Architect, or his successor, that the work for which said payment is due has been properly done, and such estimates and certificates shall not be taken and held as an acceptance of said work, or any part thereof, and exempt the parties of the second part from liability to make good any work so certified, if it be afterwards discovered to have been improperly done or not in accordance with the plans and specifications.'

"The specifications provided that the State Architect 'shall have the power to direct the manner of executing the work; shall decide upon the fitness of material and reject any work and materials that in his judgment do not fulfill the requirements of the contract. He shall settle all matters in dispute relative to the execution of the work; . . . order any work not properly done to be taken down and rebuilt, . . . and shall make all estimates for payments during the progress of the work.'

"Defendant introduced no evidence except Kansas statutes and decisions to uphold its legal contentions. It contends that the above quoted provisions of the statute and contract and specifications constituted the State Architect the sole arbiter of what was the 'completion of the building' within the meaning of the statute, and having given the so-called final estimate for $23,823.35 in January. 1919, the six months statute commenced to run from that date, and this suit, instituted October 22, 1919, was barred.

"That contention the court sustained. But as no written memo. was filed, and no oral announcements made into the record by the court, the court's opinion with reference to the $2500 deposit and defendant's express consent to the deposit and its agreement to 're-main liable to the same extent as if payment had not been made,' is not now before us.

"Defendant also contends that the suit is improperly brought in the name of the obligee in the bond. because under Kansas decisions, which were introduced in evidence, it is held that the State of Kansas cannot prosecute an action for a private person's benefit, nor unless the State has an interest in the subject-matter, and then only at the relation of its Attorney-General.

"The points which are here for review are therefore:

"First: Is this action properly instituted in the name of the obligee in the bond?

"Second: Did the State Architect's estimate in January, 1919, operate to set in motion the six months' limitation on the bond so as to make the institution of this suit in October 22, 1919, too late, when the $2500, which was deposited with the State in January, 1919,

to replace certain parts of the building, was still on deposit, when the general contractor did work on the building in July and August, 1919, and when the defendant had agreed to remain liable to the same extent as if the January payment had not been made?''

We quote from respondent's brief:

''Further answering that under the statute laws of Kansas, the decisions of the Supreme Court of Kansas, all pleaded, and the contract sued on, provided that the State Architect, R. L. Gamble, should furnish the plans and specifications for the construction of the building, and that in the contract and under the law it is agreed between all the parties that the said State Architect should be the sole arbiter of all matters in and concerning the construction and completion of the public building, and as such should make monthly estimates of the work done and completed, as called for in the plans and specifications and the contract, for the preceding month, and issue vouchers for the payment of ninety per cent of such monthly estimates.

''Reserving ten per cent from each monthly estimate for a period of three months after the building is *completed,* as provided in said contract:

'' 'Imperfect work such as settlement, shrinkage, etc., of any description, resulting from the use of material of poorer grade than provided for in the specifications, or from a deviation from the construction as set forth by the plans, without authority, and *occurring within three months after the building is completed.'*

''Provided further, that the ten per cent guaranty for the period of three months should be paid after the building had been accepted by the Board of Administration and the State Architect, as follows:

'' '. . . . the balance remaining after deducting the several payments from the above-mentioned sum, when said work has been completely finished, delivered and accepted by the Board of Administration and the State Architect.'

''Further answering, that under the contract and the law the State Architect was agreed upon as the sole arbiter between the parties, whose decision should be final, conclusive and binding of all matters under the contract, plans and specifications as to the construction and completion of the building and the work done thereunder by monthly estimates and payments, and a final estimate and payment upon completion of the building, to-wit:

'' 'It is further mutually agreed between the parties hereto that no payment made under this contract, *except the final payment,* shall be conclusive evidence of the performance of this contract, either wholly or in part, *and that no payment shall be construed to be an acceptance of defective work or improper materials.'*

''Further answering that the State Architect made eleven monthly estimates, as the work progressed, under the contract, of the work

completed each month, approved and accepted by the State Architect, and voucher issued; *and that on the 14th day of January, 1919, the final and last estimate, No. 12, of the completion of the building was made,* approved and certified to by the State Architect, as provided for in the contract and accepted by the Board of Administration as to the completion of the building starting the three-month guaranty from that time for imperfect work, and by it vouchered to the State Treasurer of the State of Kansas for payment, and paid on the 15th day of January, 1919, said final estimate being made upon the completion of the building under the contract.

"The final estimate by the State Architect, sole arbiter:

"'Voucher No. 1094.

"'Month of January, 1919.

"'Jan. 14. Estimate No. 12 & Final.

"'On account of labor and materials employed for erection and *completion* of West Wing and part of Central portion of Adm. Bldg., University of Kansas, Lawrence, Kansas. . . .

"'Approved Jan. 14, 1919.

"'(Signed) R. L. Gamble, State Architect.'

"The above final estimate of the completion of the building by the State Architect was audited and approved by the Business Manager of the State Board of Administration, and ordered paid, and was paid January 15, 1919."

On January 16, 1919, James A. Kimball, Business Manager, wrote the defendant a letter which was read in evidence at the trial. After quoting the defendant's telegram of January 13 and 15, the letter reads:

"For your information, will say that the Olson & Johnson Company desired full settlement on their contract with the State. This could not be accomplished without your consent, for the reason that we did not want to alter the terms of the contract in any way, and in view of the fact that the Olson & Johnson Company desired to change some woodwork that had not been accepted because of the fact that the plaster on the walls was so green that the woodwork became warped and it would be a waste of material to replace it for the reason that the same result would undoubtedly follow, and it was thought advisable that the walls should be given at least four months' time to cure before the woodwork was reinstalled. The construction company, of course, did not want to wait four months for final payment, and to withhold the balance due them for four months would work a financial injury to the firm, unnecessarily. Therefore, they were willing to deposit with the state a forfeit of twenty-five hundred dollars, guaranteeing to the state that they would do the work when the time was favorable. This arrangement was satisfactory, provided the change in the terms of the contract thus made would prove to be

agreeable to you. It was for that reason that we wished to have you confirm the transaction, so that there would be no question raised as to whether or not the bond you furnished this company remained in full force and effect.''

In reply to this letter the defendant, by its vice-president, wrote the letter of January 20, 1919, heretofore quoted.

I. The second contention of respondent is that the suit, which was commenced on October 22, 1919, was not brought within six months after the completion of the building, and the action, therefore, is barred by the concluding clause of the Kansas statutes, Section 60-1414. Respondent insists that the estimate, No. 12, of the State Architect, is conclusive evidence that the building was completed at that time.

The contract provides that the architect shall settle all matters in dispute relative to the execution of the work and the interpretation of the plans and specifications. He shall have power to order any work not properly done to be taken down and rebuilt. At the time this estimate was made by the architect, he, himself, had rejected certain woodwork and floors and ordered the woodwork to be taken down. He estimated that $2500 would cover the cost of replacing or rebuilding this rejected work. Because the plaster on the walls was green, that work would have to be deferred until the walls had cured. The contractor and Kimball, the Business Manager, with the approval of the Board of Administration, subject to the defendant's approval, had agreed that the contractor might receive the balance due for the completion of the building if the contractor would agree to replace the rejected work and, out of the amount due it. put up $2500 with the State Manager to guarantee the completion of the building.

The defendant at that time knew all the facts as set forth in the letter of James A. Kimball, Business Manager, dated January 16, 1919; that the rejected woodwork and defective floors could not be replaced before June 15, and that the building could not be completed before that time. It agreed that the $24,823.35 payment and the giving of the $2500 check to guarantee the completion of the building should not in any way relieve it from any of its obligations under its bond, which required it to respond to any person to whom there was anything due for material furnished in the building. If there had been a dispute between the contractor and Mr. Kimball as to whether the building had been completed according to the plans and specifications, it is settled by numerous decisions that, in the absence of fraud, bad faith or mistake, the decision of the architect would have been conclusive and binding on the parties where the contract so provides. [Howard County v. Baker, 119 Mo. 397 (4), 24 S. W. 200; 9 C. J. 772, sec. 115, and cases cited.] But there

was no matter in dispute or controversy between the contractor and the Business Manager or the Board of Administration. There was no controversy to be settled by the architect. The proposition thus tentatively agreed upon between the contractor and the manager was submitted to the defendant. The telegrams and letters which are set out above are *in pari materia* and when read together, as they must be, show conclusively that the building was not completed; that it was expressly understood and recognized by all parties to the contract, including the defendant, that it was not completed, and that for the accommodation of the contractor, the defendant agreed to accept the proposition as made if the contractor would agree to complete the building and put up with the manager a certified check for $2500 to guarantee that the work would be done. The subsequent letters show that this was what defendant meant by its telegram of January 13, 1919. The estimate was made after the receipt of this telegram. In this situation it seems unreasonable to contend that the architect intended to certify that the building was completed or that the contractor so understood the estimate, even if the language is susceptible to that construction. In the circumstances of this case it is apparent that the so-called final estimate and the agreement of the contractor to complete the building, made with the full consent of the defendant, were parts of the *res gestae* and explanatory of the transaction, and that the contractor and the defendant are each estopped to claim that the estimate is conclusive evidence of the completion of the building.

The evidence for the plaintiff shows that the contractor, in pursuance of its agreement, furnished material and worked on the building in July and August, 1919. This work was not done under the clause in the contract relating to imperfect work or latent defects "occurring within three months after the building is completed," as argued by respondent, but to replace work rejected by the architect during the progress of the building. We think the statutory provision, "from the completion," etc., means from the time the building is finished. It has been so construed by the Supreme Court of Kansas. In Hull v. Mass. Bonding & Ins. Co., 86 Kan. 342, 345, the court said:

"The language of the statute is that no action shall be brought on the bond 'after six months from the completion of said public improvements or public buildings.' A contractor who in violation of his agreement abandons work upon a building, refusing to complete it at all, might be estopped to assert in his own behalf that it was not completed, but he cannot by that course of conduct compel his creditors to accept that view. No reason is apparent why as against him they may not rely upon the language of the statute, and consider the building as completed when it is actually finished—no matter by

whom. Nor does there seem to be any hardship in holding that the surety has assumed an obligation coextensive with that of the principal. In this case the surety is not entitled to any more liberal treatment than the principal. The rule that sureties are favorites of the law does not apply. A corporation engaged in giving bonds for profit is essentially an insurance company.

''The defendant suggests that under this interpretation of the law, if a building is abandoned and never completed, the six months will never begin to run. If the officers charged with the construction of a public building should abandon all purpose of completing it, or cause a cessation of work upon it for a long period, a different question would be presented. The extension of the time for suit on the bond affords the surety no just ground for complaint, where it is occasioned solely by the fault of his principal, even should the right of action be kept alive until barred by the general Statute of Limitations. Here the board of regents seem to have used due diligence to cause work upon the buildings to be resumed and prosecuted to completion. The judgment is affirmed.''

See also State of Kansas v. Mass. Bonding & Ins. Co., 91 Kan. 75, 81, and M. K. & T. Ry. Co. v. Am. Surety Co., 291 Mo. 92, 102, 236 S W. 657.

There is no merit in this contention. The building was not completed at the time the action was commenced.

II. The other contention by respondent's counsel is that this action is brought on a statutory bond to secure the performance of a contract between the State of Kansas and Olson & Johnson Company for the erection of a building and to pay for labor and material furnished therefor, and that said contract and any action accruing thereon are governed by the laws of the State of Kansas and not by the laws of Missouri; that in order for the State of Kansas to maintain this action in this State it must appear from the petition that under the laws of Kansas a cause of action has accrued in its favor and that it is authorized to prosecute the action; that the petition does not show that the plaintiff has any interest in the result of this action, or that it is authorized to prosecute it; that under the laws of Kansas, as declared by the Supreme Court of that state, no private person is authorized to use the name of the state to prosecute an action for his benefit and that a suit cannot be maintained in the name of the state unless it has an interest in the matter in controversy.

In Hefferlin v. Sinsinderfer, 2 Kan. 401, 404, it was ruled:

''When a contract, executed under another jurisdiction, is brought here for enforcement, the law here, for the time being, governs the remedy. Any change in the law regulating the remedy here, cannot

effect the obligation of such a contract, because the law of the remedy here forms no part of the contract. . . . The *lex fori* at the time the enforcement is sought, prescribes the remedy."

In Ruhe .v. Buck, 124 Mo. 178, 183, 27 S. W. 412, Judge GANTT quoted approvingly from Scudder v. Bank, 91 U. S. 406, as follows:

"Matters bearing upon the execution, the interpretation and the validity of a contract are determined by the law of the place where the contract is made. . . . Matters respecting the remedy, such as bringing of suits, admissibility of evidence, *statute of limitations,* depend upon the law of the place where the suit is brought." (Italics ours.)

In Wharton on Conflict of Laws (3 Ed.) Sec. 736-B, we find the rule thus stated:

"Whether a third person may enforce an agreement between two other persons, the performance of which would benefit him, depends upon the substantive law of the contract, i. e., the law of the place where the contract is to be performed; *but the form of the remedy,* whether it must be in covenant or in assumpsit, at law or in equity, *is governed by the lex fori.*"

And again at Section 747, as follows:

"No matter what may be the law to which a case may be subject, the *lex fori* . . . must decide as to the form of the suit in which such case is to be presented."

In 31 Cyc. 45 the following statement of the principle is made:

"In all matters of procedure courts are governed by the laws of the jurisdiction in which they sit, without any regard to the domicile of the parties, the origin of the right or the country of the act." [See also Barnes v. Webster, 16 Mo. 258, 265-6.]

The bond sued on was given by the contractor as required by the Kansas statute, Section 60-1413, and conditioned that "such contractor or contractors shall pay all indebtedness incurred for labor or material furnished in the construction of said public building or in making said public improvements."

By Section 60-1414, it is provided that: "Any person to whom there is due any sum for labor or material furnished, as stated in the preceding section, or his assigns, may bring an action on such bond for the recovery of such indebtedness: *Provided,* That no action shall be brought on said bond after six months from the completion of said public improvements or public buildings."

It is clear that according to the law of Kansas, the *lex loci contractus,* The Winkle Terra Cotta Company was entitled to recover in an action on the bond executed by the defendant as surety, the balance due for material furnished in the construction of the building. It is also clear that the State of Kansas, if the action were brought in that state, would have no interest in the action and that such action

would have to be brought in the name of the party who furnished the material and not in the name of the State of Kansas.

Section 1162, Revised Statutes 1919, of Missouri, provides:

"Whenever a cause of action has accrued under or by virtue of the laws of any other state or territory, such cause of action may be brought in any of the courts in this State, by the person or persons entitled to the proceeds of such cause of action: *Provided*, such person or persons shall be authorized to bring such action by the laws of the state or territory where such cause of action accrued."

Section 1005, Revised Statutes 1919, reads:

"In all cases where, by the law of this State, any person is authorized to prosecute a suit to his own use, or any official bond, he shall sue in the name of the state, or other obligee named in the bond, stating in the process, pleadings, proceedings and record in such action that the same is brought at the relation and to the use of the person so suing."

Section 1162 is general and recognizes the right of the relator to sue upon the contract executed in the State of Kansas. Section 1005 is special and provides the remedy in an action on an official bond; that the action shall be brought in the name of the obligee in the bond. The obligee in the bond, by our statute, is made a mere nominal party, while the relator is the real plaintiff. The *lex fori* at the time the enforcement is sought provides the remedy and is no part of the contract. [Hefferlin v. Sinsinderfer, and other cases and authorities cited, supra.] This proposition seems to be elementary or hornbook law and needs no further citation of authorities. Respondent cites Woodward v. Bush, 282 Mo. 163, 220 S. W. 839, and other cases which have no application to the question under consideration.

III. The case was tried in the circuit court and briefed here on appeal on the theory that the Kansas statute of limitation of six months was controlling. In view of a retrial we think it proper to say that according to the authorities cited supra, the statute of limitations pertains to the remedy and forms no part of the contract. The Kansas statute relied on by defendant has no extraterritorial effect. The limitation of actions is governed by the law of the forum. [See also Parker-Harris Co. v. Stephens, 205 Mo. App. 373 (3), 224 S. W. 1036; Staples v. Waite, 30 R. I. 516, 76 Atl. 353, 30 L. R. A. (N. S.) 895, 897, and cases cited.] We think the court erred in sustaining the demurrer to the evidence. The judgment is reversed and the cause remanded. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.