(No. 32875.— )

CARL WEISS, Appellant, *vs.* JACOB BECK *et al.,* Appellees.

*Opinion filed November 18, 1953.*

TOWNSEND & TOWNSEND, of Mt. Carmel, CYRIL C. ENDICOTT, of Carmi, and BEN J. BIEDERWOLF, and NAT H. YOUNGBLOOD, both of Evansville, Indiana, for appellant.

KERN & PEARCE, and CONGER & ELLIOTT, both of Carmi, for appellees.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

Carl Weiss, plaintiff below, instituted this action in chancery in the circuit court of White County against defendants, the heirs-at-law of Minnie Stocke Stokes, to decree a virtual adoption of plaintiff by Minnie Stocke Stokes and Phillip Stocke, her first husband, pursuant to an alleged parol agreement, and to quiet title of plaintiff to certain real estate located in White County. The title

to real estate is so put in issue by this action that upon a determination of the cause either the plaintiff or the defendants will necessarily lose a freehold. (*Winkelmann* v. *Winkelmann,* 345 Ill. 566.) Hence, the appeal comes directly to this court.

George and Margaret Appel, husband and wife, resided on a farm in White County, around the turn of the century. They were the parents of two children, Phillip and Sophia, both of whom married and had children of their own. Sophia married one William Weiss, and to this union were born four sons, Joe, Adolph, Fred and Carl. Sophia Appel Weiss died in 1896 leaving her husband and four sons surviving. The youngest son, Carl, plaintiff here, was then two years of age. The four children were taken into the home of their maternal grandparents, George and Margaret Appel. Subsequently Phillip Appel and his wife took Fred Weiss as their foster son, but did not adopt him. Jacob Renschler, a neighbor, took Adolph Weiss to be his foster son, but no adoption was had. Joe Weiss, the eldest, remained with his grandparents until he was able to shift for himself. Joe was never adopted.

Carl Weiss remained with his grandparents until he was about six years old, at which time he was taken into the home of Phillip and Minnie Stocke. He continued to reside with them until after he was 21 years of age, and until he married. He lived in the Stocke home as a member of the family and worked diligently on the family farm, receiving no wages for his labors. After his marriage, Carl and his wife lived with the Stockes for a short time. Phillip Stocke then purchased an adjoining farm, and Carl and his wife moved to that farm and have continued to reside there since that time. Plaintiff never ceased to work with Phillip Stocke in the operation and maintenance of both farms until Stocke's death in 1925.

By the provisions of his will, Phillip Stocke devised to Carl Weiss, by that name, forty acres of land. That forty

acres was the land upon which stood the house where Carl and his family lived. Phillip Stocke also bequeathed two thousand dollars to Carl Weiss. The balance of his estate was given by Phillip Stocke to his widow, Minnie.

In 1928 Minnie Stocke married one James M. Stokes and moved to his home near Crossville, Illinois. In 1929 Minnie Stocke Stokes and her husband joined in a conveyance of a forty-acre tract to Carl Weiss adjoining that property devised to him by Phillip Stocke. Mrs. Stokes retained a life estate in this forty-acre tract.

Her second husband having passed away in 1937, Minnie Stocke Stokes returned to the former Stocke farm where she lived almost continuously until her death on May 17, 1951. She did spend a few months with her brother, Herman Gates, in his home at Mill Shoales, Illinois. Mrs. Stokes died intestate. Her estate is pending in the county court of White County. Herman Gates, one of the defendants, and Phillip Weiss, son of the plaintiff, are co-administrators thereof.

Plaintiff instituted this action by a complaint which, upon a motion that it be made more certain, was amended and alleged the following : That when plaintiff was six years old Phillip Stocke and Minnie Stocke, his wife, entered into a verbal agreement and arrangement with plaintiff's maternal grandparents, George and Margaret Appel, that they, the Stockes, would adopt and rear plaintiff; that pursuant to said agreement plaintiff was taken into the Stocke home where he lived and worked as part of the family until after he was of legal age, having thus performed the agreement entered into by the Stockes in all respects as a dutiful, obedient, and devoted child; that he continued to assist in the operation and management of the Stocke farms until the death of Phillip Stocke, and thereafter to assist, care for, support and maintain Minnie Stocke Stokes until her death, except during the time she was married to and living with James M. Stokes.

Plaintiff further asserted that he was treated always as a member of the family and became commonly known as "Carl Stocke" in the neighborhood; that no wages were paid to plaintiff by the Stockes at any time; that Phillip and Minnie Stocke referred to plaintiff's children as their grandchildren; that Minne Stocke Stokes was bedfast for more than a year prior to her death, and that during such time plaintiff and his wife attended her practically constantly. Plaintiff alleged that by their conduct Phillip and Minnie Stocke confirmed and established their agreement to adopt plaintiff and to rear him as their own son and child. Plaintiff then prays for specific performance of the agreement for adoption as alleged, and that he, as the only child of Minnie Stocke Stokes, be declared the owner in fee simple of all real estate.

The defendants, heirs of Minnie Stocke Stokes, filed a counterclaim praying a decree quieting title in them, and asking partition among themselves.

Trial was had before the circuit court of White County and witnesses were presented by both sides. The decree of the court found that the equity of the cause was against the plaintiff and in favor of defendants in the original complaint, against the plaintiff on the counterclaim of the defendants and in favor of the counterclaiming defendants. It was further found by the court that the evidence did not sustain the allegations that a contract for adoption existed, and hence plaintiff had no interest in the real estate in question. The trial court therefore decreed a dismissal of the original complaint for want of equity and at plaintiff's costs.

Numerous witnesses were presented before the trial court by both parties to this action. Plaintiff presented Charles Stocke, brother of Phillip Stocke, who testified that he saw Carl Weiss's natural father bring the plaintiff to Phillip Stocke's home, that the Stockes referred to Carl as "the boy" and raised him as their own, and that Phillip

Stocke told his brothers and sisters that he and his wife did not intend for their relatives to get what they had, but they intended for the boy they were raising to get all they had. Charles Stocke heard them mention adoption several times and was of the impression that Carl had been adopted.

Oscar Stocke, a nephew of Phillip Stocke, only knew plaintiff as a member of the Stocke household, whom he thought was adopted, since Phillip Stocke and Carl Weiss were like father and son. He heard Minnie Stocke Stokes refer to Carl Weiss's family as "the children" and "grandchildren." Carl called them Uncle Phillip and Aunt Minnie, and the youngsters referred to the Stockes as "grandma" and "grandpa."

Dayton Hendershot was told by Phillip Stocke that Carl was not adopted, and that he gave Carl a horse, bridle, a saddle and some money when he was 21.

Phillip Stocke told John Miller, his cousin, and also one of plaintiff's witnesses, that he had adopted Carl and called him his son. Miller heard Carl call the Stockes, Phillip and Minnie, and dad and mother.

However, John Etienne, another witness for the plaintiff, testified Phillip Stocke told him Carl was not adopted because he could not afford the $50 costs, and Carl's father would not pay half of the fee.

Mario B. Wallace, a family friend of the Stockes, related that once in a conversation Phillip Stocke told him that Carl was not his boy, but he was going to adopt him.

Plaintiff's daughter, Frances Weiss Stahl, produced several entries in her diary over several years time, referring to "Grandma Stokes." She recalled a conversation during which Minnie Stocke Stokes told her that when Carl was born, his mother confided to Minnie that she felt she would never raise him and she wanted Minnie to have him if anything happened.

Among those testifying for the defendants was Jacob Beck, a brother-in-law of Minnie Stocke Stokes. He said

he heard Minnie say they, the Stockes, would take Carl and try him, but they would not adopt him.

Josephine Gates, a sister-in-law of Minnie Stocke Stokes, likewise testified that Minnie said she never adopted Carl and never intended to do so. During her final illness Minnie told her that Carl had been given all that he deserved, and she wished to take care of her brother Herman and her sister Mary.

A friend, Charles Fleming, said plaintiff was known as "Carl Weiss" in the neighborhood and never as "Carl Stocke." However, this same witness did send a card to plaintiff addressed to "Carl Stocke."

Several other witnesses testified for each party. Many of them said nothing which would bear on the issue of whether a contract for adoption of plaintiff ever existed or not. Most of the witnesses knew Carl Weiss only after he was living in the Stocke home, and could have had no knowledge of any arrangements made for adoption.

There is little doubt that through all the years since he came into the Stocke home plaintiff conducted himself in all ways as a dutiful and obedient child. It is, nevertheless, a settled rule of law that to be entitled to a decree for specific performance of a contract for adoption it is necessary that the contract be proved as alleged and according to the standard of proof required. (*Kramer* v. *Cooper*, 347 Ill. 293.) In this State it is settled that a court of equity will not decree the specific performance of a contract the existence of which depends upon parol testimony unless the proof is clear and conclusive of its existence and terms. In such case the evidence must be clear and explicit, leaving no room for reasonable doubt, and the contract must be certain with all of its terms clearly proved. (*Mould* v. *Rohm*, 274 Ill. 547.) Courts of equity accept with caution evidence offered in support of a contract to make disposition of the property of a deceased person different from

that provided by law and weigh such evidence scrupulously. *Hutton* v. *Busaytis,* 326 Ill. 453.

There have been nine decisions in Illinois courts involving the same issues presented upon this appeal. Of these nine cases, only three resulted in a decree enforcing the alleged agreement for adoption, while the remaining six refused so to do. Those three cases decreeing the existence of a contract to adopt are *Lee* v. *Bermingham,* 199 Ill. App. 497; *Winkelmann* v. *Winkelmann,* 345 Ill. 566; and *Soelzer* v. *Soelzer,* 382 Ill. 393. In each of these cases the proof included either a written memorandum of the alleged agreement to adopt found among the papers of the deceased foster parents, or the positive testimony of some surviving witness who was present and heard the making of the agreement to adopt. No such proof is found in the record of the instant case.

Considering all of the evidence presented here, there is no clear, positive indication that any agreement to adopt plaintiff was ever executed by Phillip Stocke and his wife, Minnie Stocke Stokes. There are two isolated statements attributed to Phillip Stocke that he had adopted plaintiff and that he intended to adopt him. Several asserted statements of both Phillip and Minnie to the effect that they had not adopted plaintiff or that they would not adopt him appear from the testimony of witnesses presented by both sides. Several witnesses thought that plaintiff was adopted, but only because of the aura of family relationship existent in the Stocke home. Certainly, there is no positive indication that an agreement to adopt plaintiff was made by anyone, and definitely no evidence of the agreement, as alleged in the complaint, between George and Margaret Appel, his maternal grandparents, and the Stockes. One witness states that plaintiff's father, William Weiss, took the boy to the Stocke home. Another witness states that plaintiff's aunt, Mrs. Phillip Appel, suggested to the Stockes

that they take Carl. No scintilla of evidence connects George and Margaret Appel, plaintiff's maternal grandparents, with any of the adoption arrangements, other than the mere fact that plaintiff's home was with the Appels immediately prior to his acceptance into the Stocke home. All of the parties to the alleged oral agreement are deceased, and no one testified who heard any agreement made or who was present when any arrangements to take the plaintiff into the Stocke home were discussed. The fatal omission to connect the Appels with the adoption agreement as alleged, plus the unsatisfactory and contradictory nature of the evidence presented is certainly not such clear and conclusive evidence as leaves no reasonable doubt of the existence of such a contract.

Plaintiff maintains that a verbal agreement to adopt may be established from such facts and circumstances as will raise an implication that it was made and may be reinforced by evidence of the conduct of the parties. We have failed to find where this rule has been applied in Illinois. Those cases relied on by plaintiff as supporting this rule are all from foreign jurisdictions. Also, in those cases the facts and circumstances relied on were much more convincing than the evidence here presented. Even were such rule properly applied here, the facts and circumstances would have to be so clear and conclusive as to leave no reasonable doubt. Such is not the case in this instance.

Among the cases cited by plaintiff in support of the rule he urges is that of *Roberts* v. *Roberts*, 223 Fed. 775, upon which plaintiff relied most heavily in his argument. The cited case is a Missouri cause, determined in the Court of Appeals, eighth circuit. In that case the record disclosed that the foster father was, in fact, the actual father of the plaintiff. The father, having no children from his marriage, took the plaintiff as an infant, giving her his name and that of his mother. The foster parents repeatedly stated that they had adopted plaintiff and treated her as their

child. She was baptized in their name. Only when Mrs. Roberts was on her deathbed, and plaintiff was grown, was she informed that she was not the natural child of her foster parents. In that case the evidence of circumstances and conduct is overwhelmingly in accordance with the inference of a contract to adopt. No such strong and compelling evidence appears in the instant case giving substance to such an inference. The circumstances here are easily explained by theories other than a contract of adoption.

Plaintiff points to several circumstances in the evidence that he contends prove the contract for adoption. There were several related statements of Phillip Stocke and Minnie Stocke Stokes that plaintiff would get everything they had when they were gone. One witness testified that the Stockes said they had adopted Carl, and another testified that the Stockes asserted they would adopt plaintiff. Some witnesses asserted that Carl addressed the Stockes as "Dad" and "Mother," while others said he only called them Uncle Phillip and Aunt Minnie. He was a dutiful and affectionate son to them, and their home life was that of a family. After his marriage Carl Weiss continued to treat the Stockes as his parents, calling frequently in their home, and working for and with them. The Stockes referred to plaintiff's family as "the children" and their "grandchildren." All of this evidence is consistent with the existence of an oral agreement to adopt, but it by no means clearly and conclusively proves the existence of such a contract, or the terms thereof. All of the facts could as readily be harmonized with a theory that plaintiff was merely taken to raise in a good home. *Hutton v. Busaytis,* 226 Ill. 453.

During the course of the trial, defendant Joseph Beck, husband of Minnie Stocke Stokes' sister, Mary, who had died since Minnie's death, and defendant, Herman Gates, brother of Minnie, testified as witnesses. Plaintiff asserts that these witnesses were incompetent to testify under sec-

tion 2 of the Evidence Act. (Ill. Rev. Stat. 1953, chap. 51, par. 2.) That section provides that "No party to any civil action, suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein of his own motion, or in his own behalf, by virtue of the foregoing section, when any adverse party sues or defends as the trustee or conservator of any habitual drunkard, or person who is mentally ill or mentally deficient, or as the executor, administrator, heir, legatee or devisee of any deceased person, or as guardian or trustee of any such heir, legatee or devisee, unless when called as a witness by such adverse party so suing or defending," and in certain enumerated exceptions, none of which fit this situation. Plaintiff complains that two of the defendants were permitted to testify, while he was not permitted to do so.

Section 2 of the Evidence Act only precludes a party to an action from testifying where any adverse party sues or defends as an heir of a deceased person. Each of these defendants defends as an heir of Minnie Stocke Stokes, deceased. Plaintiff in this case brings his suit as an individual for specific performance of an alleged contract to adopt. His right to share in the estate of Minnie Stocke Stokes as an heir will arise only if such specific performance is granted. He does not bring his suit as an heir, or any other classification of party whose adversity would prohibit testimony by the defendants.

The testimony of the two defendants was properly received by the court under the Evidence Act. It is not the heir who is disqualified from testifying under the Evidence Act, but it is the party adverse to the one suing or defending as an heir that is disqualified. *Bailey* v. *Robison,* 244 Ill. 16.

Where the evidence is conflicting and all of the material facts are in dispute, the chancellor who saw and heard the witnesses in open court is better qualified to judge the weight of the evidence than is a court of review,

and his findings are entitled to great weight and will not be disturbed by this court·unless clearly and palpably against the weight of the evidence. (*Dean* v. *Dean,* 401 Ill. 406; *Baker* v. *Baker,* 412 Ill. 511.) Here, the chancellor did see and hear all of the witnesses, and made findings adverse to the contentions of the plaintiff. We cannot say that those findings are contrary to the weight of the evidence. The decree of the chancellor is, rather, entirely in accord with the principles of law as applied in Illinois. No error being manifest, we are not inclined to reverse the findings and verdict of the chancellor. Accordingly, the decree of the circuit court of White County is affirmed.

*Decree affirmed.*