Virginia May Hays LUKAS, Appellant,

v.

P. C. HAYS, Administrator of the Estate of Howard B. Hays, Deceased, and Howard B. Hays, Jr., Respondents.

No. 44785.

Supreme Court of Missouri, Division No. 1.

Nov. 14, 1955.

Hyde & Purcell, Poplar Bluff, for appellant.

Byron Kearby, Poplar Bluff, Max M. Fleisher, Leonard W. Koplin, Chicago, Ill., for respondents.

HOLMAN, Commissioner.

█ This is a proceeding in equity in which plaintiff (appellant), Virginia May Hays Lukas, seeks to enforce an alleged oral contract of adoption and to have herself declared a lawful child and heir of Howard B. Hays, deceased. Plaintiff contends that the contract was entered into between her mother, May Talmadge Haizlip, and Howard B. Hays and Vera Hays, his wife, and that it was fully performed by plaintiff and her mother. The defendants are P. C. Hays, administrator of the estate of Howard B. Hays, and Howard B. Hays, Jr., the only natural child of Howard B. and Vera Hays. The trial court denied plaintiff the relief she sought and decreed that defendant (respondent) Howard B. Hays, Jr., is the sole heir of said deceased and thus entitled to the entire proceeds of his estate. Plaintiff has duly appealed. We have jurisdiction since the amount in dispute is one half of the Hays estate which was appraised at $64,000.

The evidence is voluminous. It contains a recital of many circumstances, incidents, statements and conversations extending over a period of more than 25 years. We shall attempt to summarize the testimony in as brief a manner as appears consistent with a proper correlation of the facts and an understanding of the issues presented.

The only direct testimony as to the specific contract was given in the deposition of May Haizlip. Her maiden name was Hays but she was not related to Howard B. Hays. She was, however, a half sister of Vera Hays. May gave birth to plaintiff, out of wedlock, on September 9, 1925, in San Francisco. She had previously been married to and divorced from one Barrett and a son, Hays Barrett, was born of that marriage. At the time plaintiff was born, May was living with her mother, Mrs. C. W. (Anna) Hays, now deceased.

May testified that she was in the hospital about three weeks and upon dismissal left the baby there, her mother having made arrangements with a trained nurse to care for her. On the day May went home from the hospital her mother, Anna, called Vera Hays in Du Quoin, Illinois, and told her of the birth of plaintiff. She said further, "the reason I am calling is that I feel that she must give the baby away for adoption, and I knew that you and Howard had always wanted a baby, especially a little girl, and thought of you immediately. It would work out better if you would take her." May also took the phone and talked to Vera who said she couldn't make any decision until she talked with Howard. That evening Howard and Vera called back and after they gave Anna their affirmative decision to take plaintiff, May took the phone and talked with each of them. Her version of the conversations is as follows: "Q. Tell us what you can recall of that conversation with Vera. A. Well, Vera was very ebullient, she said, 'Oh, we are going to take the baby, and I am so happy about it, and everything is going to be all right.' Q. Did she say for what purpose she was going to take the baby? A. For adoption. * * * And Vera said, 'Howard wants to speak to you.' He said to me, 'Vera and I will be very happy to have the baby. We will make all the arrangements for her adoption, and we have always wanted a little girl, and this seems to be the answer to our prayers,' and then he started trying to comfort me, and he said, 'You must realize that you are very young, and in a few years this won't seem a tragedy to you as it does now.' Q. Did you let your mother take the phone again? A. Yes. Q. What, if anything, did she say? A. She said she would make the arrangements to send the baby on, and that she would do it immediately, and that she would get a trained nurse, a very responsible person, and she suggested meeting the nurse in St. Louis."

Shortly after this conversation the baby was sent to St. Louis in the care of a nurse

and there delivered to Vera Hays. (May was probably mistaken as to the time that elapsed before the child was sent to St. Louis, as other evidence indicates that plaintiff was delivered to Vera early in February, 1926.) About a week or so after the baby was sent, May received a document from the Hayses which she signed before a notary public and returned to them. Its contents were summarized by the witness in this manner: "The document said, in effect, that I was the child's natural mother, that I was in my right mind and that I would give possession of this child to my half sister, Vera Naomi Hays, and to her husband, Howard Bruce Hays, for adoption, and that I relinquished all further claim to her whatsoever." (There is no evidence that plaintiff was ever legally adopted by the Hayses and this document was not found among their papers.)

Thereafter, May never saw plaintiff over two or three times although, in the capacity of an aunt, she kept in contact with plaintiff and Vera and sent plaintiff numerous gifts. She unquestionably relinquished all claim upon, possession and control of, plaintiff to Howard and Vera Hays. Thereafter, May married one Haizlip. She subsequently became a famous aviatrix and has lived in many American cities as well as foreign countries.

It would be useless to recite herein the many details in evidence as to the relationship between plaintiff and the Hayses as she grew up in the Hays home. From the day she arrived in their home plaintiff was unconditionally and absolutely held out to the world as the daughter of Howard and Vera Hays and was so accepted by the public generally. They did so with such amazing success that for 27 years the people in the various communities where the family lived thought she was their natural child. Vera died in October 1950 and Howard in June 1952. Plaintiff did not learn until after Howard died that she was not their natural child. The Hayses, May Haizlip, Mrs. C. W. Hays, Howard Hays, Jr., and his wife were the only persons who knew that plaintiff was not the natural born child of Howard Hays and wife.

From the time plaintiff entered the Hays home until she graduated from high school she was a dutiful, obedient and loving child. The Hayses were proud of her grades, her progress generally and loved her as their child. Edna Douglas, who was Mr. Hays' secretary for 14 years, often saw him and Virginia together. In describing their relationship she said Mr. Hays "almost revered her. She was something very, very special" and "she adored him."

About the time Virginia graduated from high school an unpleasant situation arose. The Hayses had planned that Virginia would attend a small college in Missouri. She did not want to do so but, on the contrary, desired to marry Stanley Lukas. They did not approve of him for religious reasons. Plaintiff left the home and on May 12, 1945, married Lukas. They established a home in Stanford, Connecticut, where they still reside. For a time the relationship between plaintiff and Mr. and Mrs. Hays was strained. However, after the birth of Virginia's first child (she now has three) they again became intimate. The feeling of Howard Hays toward plaintiff and her family is illustrated by excerpts from a letter he wrote her, a few months before he died, upon the occasion of the birth of her third son, as follows: "My dear daughter: Your letter of the 10th came today. Yes, the message announcing the arrival of little Charles Howard did come a little earlier than I had expected but I am glad now that is over and that you and the baby are getting along so well and that you are on the road to recovery. I think you gave the baby a pretty name and I am so pleased that he has Howard in his name. Both Charles and Howard are old, old family names. You and Stanley are certainly blessed with fine sturdy little sons. I am blessed too with two sons, two daughters [obviously including plaintiff as a daughter and her husband as a son] and three grandsons. It has been a long time since I wrote to you but little sweetheart I have been so sick ever since I came here. I am glad you were pleased with the flowers and glad that I could send them to you. Remember me to Stanley and the boys, I

love each and every one of you with all my heart. Daddy."

Howard Hays had been a successful engineer. He and Vera lived in a number of cities in Illinois and elsewhere, but from 1931 to 1951 the home was in Waukegan, Illinois, where he had a responsible position with an industrial concern. In February, 1951, Howard sold his home and moved to his old family home in Poplar Bluff, Missouri. He was then ill with cancer, his wife had died, and he had retired from his position. He occupied an apartment in the home place. His sister also lived in that residence and a brother (defendant Paul C. Hays) lived next door. The brother, a banker, in his daily visits with Howard, frequently talked with him about the disposition of his estate. Finally, at Howard's request, Paul prepared a proposed will and submitted to him. Howard never executed this document and it was found among his papers after his death. It provided that the bulk of the estate be placed in trust; that Howard, Jr., receive the income during his lifetime, and after his death, the income and upon reaching age 25 the corpus, was to be distributed to testator's grandchildren. At that time the only grandchildren were the children of plaintiff. The trustees were further given the discretionary right to use the trust assets for the maintenance of plaintiff and her children or to meet emergency expenses occasioned by sickness, accident or otherwise. He explained to Paul that he did not want to leave anything directly to Virginia because "Vera didn't want Virginia to have the property because she had married a Catholic."

■ Both Mr. and Mrs. Howard Hays, Jr., were permitted to testify to various individual statements, made about 1950 and thereafter, of Vera and Howard to the effect that Howard, Jr., was their only real child; that Virginia had never been adopted and that after they died all the property would go to Howard, Jr. Plaintiff, citing Pursifull v. Pursifull, Mo.Sup., 257 S.W. 117, made strenuous objections to all this line of inquiry contending that these were self-serving declarations and were incompetent to prove that there was no contract for adoption. The contention is renewed here. Upon the authority of the Pursifull case (and other cases in which it is cited with approval) we rule that these declarations were self-serving and were not admissible. Accordingly, we will not consider this testimony in arriving at our decision herein. Other facts will appear in the course of the opinion.

■ This being an equitable action it is tried de novo here upon the record made in the trial court. It is well established that our duty requires that we weigh the evidence and reach our own conclusions on the facts. Ordinarily, we give some deference to the trial court's findings because of that court's more favorable opportunity to determine questions of credibility. Cleary v. Cleary, Mo.Sup., 273 S.W.2d 340. Most of the evidence in the instant case, however, was either documentary or in the form of depositions. The rule of deference does not apply to this type of evidence. Creek v. Union Nat. Bank in Kansas City, Mo.Sup., 266 S.W.2d 737. Under the circumstances we will proceed to make our own determination of the facts without any substantial deference to the findings of the trial court.

The question arises at the outset as to the law applicable to the vital issue here presented. It may be noted that Howard and Vera Hays were residing in Illinois at the time the alleged agreement was made and hence it may be said that the law of that state would govern. On the other hand, all of the property in question appears to be located in this state and administration of the estate is proceeding in the probate court of Butler County, Missouri, and therefore it can be argued that the laws of Missouri should control as to the determination of the heirs entitled to the ultimate distribution of the estate.

■ It is clear that the law of Missouri, the lex fori, governs herein as to all procedural matters such as the rules of evidence, the competency of witnesses, the burden of proof, the weight of the evidence and to other matters that may relate to the

remedy. State of Kansas ex rel. Winkle Terra Cotta Co. v. United States Fidelity & Guaranty Co., 322 Mo. 121, 14 S.W.2d 576. We have decided that it is unnecessary and would be unrewarding to determine whether the substantive law of Missouri or Illinois is controlling herein, as the courts of each state recognize the doctrine of equitable adoption. Weiss v. Beck, 1 Ill.2d 420, 115 N.E.2d 768; Winkelmann v. Winkelmann, 345 Ill. 566, 178 N.E. 118; Soelzer v. Soelzer, 382 Ill. 393, 47 N.E.2d 458; Fisher v. Davidson, 271 Mo. 195, 195 S.W. 1024, L.R.A.1917F, 692; Lynn v. Hockaday, 162 Mo. 111, 61 S.W. 885; Taylor v. Coberly, 327 Mo. 940, 38 S.W.2d 1055.

■ Plaintiff concedes that in order to establish an oral contract of adoption she has the burden of proving the agreement by clear, cogent and convincing evidence. Taylor v. Hamrick, Mo.Sup., 134 S.W.2d 52. We will therefore proceed with a consideration of the question as to whether the record herein indicates that plaintiff has presented sufficient evidence to meet this strict requirement.

■ Clearly, the most important testimony offered by plaintiff was that of her mother, May Haizlip. At the trial, and again in this court, defendants contend that she was disqualified under the provisions of Section 491.010, RSMo 1949, V.A.M.S. We find no merit in this contention. The cases cited by defendants do not support this assertion. On the contrary, this identical question was before this court in the case of Signaigo v. Signaigo, Mo.Sup., 205 S.W. 23, in which it was held that the natural mother of the alleged adopted daughter was competent to testify as to the parol agreement of adoption. See also, Taylor v. Coberly, supra, and Taylor v. Hamrick, supra.

■ As we have already indicated, it is well settled that a court of equity has jurisdiction to enforce an oral contract of adoption and to decree that the child is an adopted child and heir of the adopting parents, where the agreement has been fully performed by the child, and it would be

inequitable to deny adoption. While the evidence must be of the quantum and character as heretofore discussed, the agreement need not be shown by direct evidence but may be proved by acts, conduct and admissions of the adopting parents clearly indicating that an agreement to adopt must have existed. Bland v. Buoy, 335 Mo. 967, 74 S.W.2d 612; Drake v. Drake, 328 Mo. 966, 43 S.W.2d 556. While the evidence in the instant case may be sufficient to come within the foregoing rule, plaintiff is not compelled to entirely rely thereon as May Haizlip gave direct and positive testimony as to the specific agreement.

■ We have carefully considered the record in this case and have concluded that plaintiff has established by clear, cogent and convincing evidence that she was taken into the Hays home under the terms of an oral agreement between her mother, May Haizlip, and the Hayses that she would be adopted as a child of Howard and Vera Hays.

May Haizlip testified clearly and convincingly that there was such an agreement. We believe her testimony. Nothing was shown in her deposition or in the other evidence that would indicate that she was unworthy of belief. Careful cross-examination failed to disclose any weakness in her story. Defendants in their brief vigorously assail her testimony asserting that it is false. They point first to her interest since plaintiff is her natural daughter. The element of interest has received our careful consideration along with other factors in evidence that may be properly considered in determining the weight to be accorded to her testimony. It is also urged that she should not be believed because she has forgotten some of the details surrounding the birth of plaintiff, and the events occurring shortly thereafter, and is in error as to others. We think this is natural and normal. For example, May stated that the Hayses lived in Du Quoin, Illinois, at that time, when other evidence indicates that they lived in Jacksonville. This mistake would seem to be understandable when it is considered that within a few years the Hayses lived in

Du Quoin, Jacksonville, Chicago, Hillsboro and Waukegan, all located in Illinois. The fact that there were some omissions and errors in the testimony of this witness would not indicate to us that she would not clearly remember an important agreement that was to vitally affect the future of her daughter.

We are further convinced that May signed and returned to Howard and Vera a legal instrument releasing all of her control over plaintiff and consenting to the adoption. Howard is shown to have been a very careful and conservative man. It is inconceivable that they would have taken plaintiff, pretending from the beginning that she was their flesh and blood child, without having had the protection of such a release. It may be that they considered it unnecessary to go ahead with the legal adoption. Moreover, even if they had desired to do so they were confronted with an anomalous situation. They could not have proceeded to formally adopt plaintiff without disclosing, at least to a limited number of people, the closely guarded secret they kept so successfully for over 25 years. May was questioned as to why she did not subsequently make an investigation to determine whether the Hayses had actually adopted Virginia. She answered, "After I signed the document there was no further discussion because I felt the matter was closed. * * * She was their baby. I had given her up." We think this was a perfectly normal position for a layman to take.

Defendants offered in evidence a card Vera had received from her Sunday School class, dated February 13, 1926, which referred to the little girl. On the back of it was written in Vera's handwriting the following, "In Jacksonville, Ill., after I had taken Virginia May much against Howard Sr.'s wishes." They now strongly assert that May's testimony, indicating that Howard so readily consented to take Virginia and adopt her, is refuted by Vera's notation on the back of this card. Plaintiff answers this contention by arguing that it is reasonable to assume from the message on the front of the card that Vera had taken Virginia with her the preceding Sunday when she attended Sunday School and that the notation refers to Howard's objection to the fact that she had taken the infant to Sunday School. We do not know what was meant by this notation. We do know that if it is construed as defendants contend, it is certainly inconsistent with the admitted fact that Howard immediately consented to the pretense that Vera had actually given birth to the child and that he loved the baby as his own from the beginning. Under the circumstances we cannot attach much significance to this notation.

The conclusion seems inescapable that the testimony of May Haizlip as to the agreement is strongly corroborated by the acts and conduct of Howard and Vera Hays after they took this child. To the greatest extent possible they did everything they could to make Virginia their natural child. All records (including school and census) and all their statements and conduct so indicated. Vera even prepared a family tree showing Virginia's lineage as their daughter. Their astonishing success is shown by the fact that plaintiff was accepted by all who knew her as the child of their flesh. Defendants attempt to meet the force of this evidence by pointing out that this conduct should not only be consistent with the reasonable presumption that it was done in reliance upon such a contract, but inconsistent with the theory that it was done for any other reason. They say that the Hayses, in taking the child and falsely pretending it was born to them, were motivated by a desire to shield May Haizlip and Virginia from the shame of illegitimacy.

We regard this argument as rather tenuous. May never had plaintiff with her after she left the hospital. Certainly, in a great city like San Francisco, this infant could have been placed in a good home for adoption without any further embarrassment to May. In this way May could have been spared the embarrassment of ever disclosing the fact of the birth of the child to Vera and Howard. Moreover, if they merely took the child as an accommodation to May they could have simply announced to friends that they had taken an orphan child without pretending that it was their own. Of course, it must be admitted that

from the time Virginia was taken, until the death of Howard, the life of the Hays family, as relates to this child, must be construed as a deception. However, if we are to give to it the effect that defendants claim, it must also be considered as a cruel fraud upon this child. We are unable and unwilling, in considering their course of conduct, to attribute such an intention to these fine, Christian people.

Next, defendants point to the absence of any evidence that Vera and Howard told anyone that they had adopted Virginia. We regard this as of very little significance. Since they pretended to the world that she was their natural child, there were only three people now living (May, Howard, Jr., and his wife) to whom they could have consistently made such a statement.

▮ Each case of this nature must, of necessity, be decided upon the facts and evidence appearing therein. For that reason precedents may not be of much value in determining the sufficiency of the proof. We desire to observe, however, that the evidence in the instant case appears to be as strong or stronger for plaintiff than is indicated in the cases of Remmers v. Remmers, Mo. Sup., 239 S.W. 509, Drake v. Drake, supra, Taylor v. Coberly, supra, and Fisher v. Davidson, supra, in which adoption was decreed.

May Haizlip fully performed her part of the agreement by delivering Virginia to the Hayses and thereafter asserting no further claim to or control over the child. Plaintiff's part was definitely performed, as she became as much their child as if she had actually been born to them. Her situation is illustrated by the following: "Taken at an age when she was too young to know who she was, advantage was taken of her very helplessness in that respect; her mind was obscured to the truth, and forced to believe in the fictitious condition. She was taken possession of, mind and body, and molded as her adopting parents desired. Like a bud that has been cut from its natural stem and grafted into a foreign tree, she grew into the family, and became a part of its very life. Everything that adoption contemplates was accomplished." Lynn v. Hockaday, 162 Mo. 111, 126, 127, 61 S.W. 885, 889. Vera and Howard Hays fully performed their part of the agreement except for the formal, legal adoption. Equity and fairness require that this omission be supplied by a decree of equitable adoption. Under the circumstances of this case we think it would be equitable to assess all costs against the defendant administrator to be paid out of the Hays estate.

The decree herein is accordingly reversed and the cause remanded with directions to the trial court to enter a decree to the effect that plaintiff is the adopted child of Howard B. Hays and as such is a legal heir of said deceased, entitled to share with Howard B. Hays, Jr., in the distribution of said estate, and to incorporate such other provisions in said decree as are necessary to dispose of the case in conformity with the views herein expressed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.