May J. CLEARY (Plaintiff), Appellant,

v.

Edward P. CLEARY, Jane K. Cleary, and Charles C. Cleary (Defendants), Respondents.

No. 44268.

Supreme Court of Missouri.

Division No. 2.

Nov. 8, 1954.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 13, 1954.

Chas. L. Graham, Christian F. Stipp, Graham & Stipp, Carrollton, for appellant.

W. A. Franken, John Franken, Carrollton, for respondents.

BENNICK, Special Judge.

This is a suit in two counts in which the plaintiff asks that two certain deeds be set aside and declared null and void and of no effect, and that title to the lands described in the deeds be vested in her.

Plaintiff, May J. Cleary, is a spinster now 72 years of age, who was living alone at the time of the trial on a part of the land in question, which is located about a mile east of the town of Norborne in Carroll County, Missouri.

The defendants are plaintiff's brother, Charles C. Cleary; a nephew, Edward P. Cleary; and the latter's wife, Jane K. Cleary.

Defendant Edward P. Cleary is the son of plaintiff's deceased half brother, James. Another brother, E. Pierce Cleary, died on October 12, 1952, some two and one-half months after the making of the deeds which plaintiff seeks to have avoided in this proceeding. The name of a married sister, Clara Lenzen, also appears throughout the case.

The land in question consists of a total of 240 acres, comprising two adjoining rectangular tracts of 120 acres each.

At the time of plaintiff's birth all 240 acres were owned by her father, James Cleary, and her mother, Emma Cleary. The family originally resided on the east 120 acres, and for that reason the east tract was always known and referred to as the home place. However in 1910 the father constructed a house on the west 120 acres, and moved his family, including plaintiff, into it. In the ensuing years this was plaintiff's residence, and it was here that she was living at the time of the trial in January, 1954.

Title to all the 240 acres remained unchanged until the father's death in 1922, whereupon the mother became the sole

owner of the land, and so continued until her death in 1936. At this juncture, by will or otherwise, plaintiff became the owner of the home place or east 120 acres, while her sister, Clara Lenzen, became the owner of the west tract of 120 acres. With each of the tracts thus separately owned, the west 120 acres thenceforth became known as the Lenzen place, and was so referred to throughout the trial.

All through the years the entire 240 acres had been operated as a single farm, and this practice continued after the division of the two tracts upon the mother's death. During the period following the mother's death both tracts were managed by the bachelor brother, E. Pierce Cleary, who looked after all the business matters and paid each sister her proportionate share of the rent. Plaintiff's relations with Pierce were very close, and the two of them made their home together until his death in October, 1952.

Clara Lenzen suffered with ill-health, and in February, 1952, sold her tract of land to plaintiff, who thus became the owner of the entire 240 acres.

Plaintiff had always done all of her banking business at the Citizens Bank in Norborne of which one Milton Heil was executive vice-president and cashier. Heil had been connected with the bank for some 13 or 14 years, but he and plaintiff had known each other throughout his entire life. Plaintiff reposed trust and confidence in him, and consulted him about all of her business affairs, including the execution of her will, which he had rewritten for her at several different times as she had seen fit to make changes in it regarding the disposition of her property.

By the terms of her will, which had been executed prior to her purchase of the Lenzen place, plaintiff had made provision for the disposition of the home place, but of course had made no provision for the disposition of the Lenzen place which she did not own at the time. According to her testimony, she had directed that the home place be devised to her brother Pierce for his lifetime, and then to her brother Charles for his lifetime, and at Charles' death to her nephew, Edward, and his wife, Jane, absolutely. Following her acquisition of the Lenzen place she destroyed her will which had become insufficient for the disposal of her entire estate; and she had no will at the time of the making of the deeds which are the subject of the instant controversy.

It would appear that plaintiff had always been on good terms with both Edward and Jane, at least up until the time of Pierce's death, after which, according to plaintiff, they never visited her again, although she was in their home on several occasions and had no complaint about her reception. While difficulty within the family circle over the disposition of plaintiff's property had seemingly been brewing for some little time, it was not until after Pierce's death that matters reached a climax culminating in the institution of the present suit only 10 days later. In other words, it was the necessity for taking sides that was responsible for whatever change in attitude ensued, and Edward elected to follow the lead of his Uncle Charles, between whom and plaintiff there was evidently a marked dislike. Certainly, prior to the break, it had been plaintiff's desire that Edward and Jane should be the ultimate objects of her bounty as had been evidenced by the terms of her will, devising them the home place, subject to life estates in her two brothers, at a time when the home place was all she owned. Her acquisition of the Lenzen place of course rendered it desirable that she make arrangements for its disposition; and she admitted that she had promised Edward to give the Lenzen place to him, but insisted that she had made no mention of where she intended the home place to go.

The two deeds which plaintiff seeks to have set aside were general warranty deeds, the one purporting to convey the home place to Pierce for life, and then to Charles for life, and then to Edward and Jane absolutely; and the other purporting to convey the Lenzen place to Edward and Jane, without mention of either Pierce or Charles.

Each deed reserved to plaintiff the right to the possession and use of, and all income derived from, the particular real estate conveyed for and during her natural life.

The first count of the petition prayed for the cancellation of the deed to the home place, while the second count prayed for the cancellation of the deed to the Lenzen place.

Plaintiff made no charge of fraud in her petition, but instead based her claim for relief upon the proposition that there was no lawful delivery of the deeds, both of which she admittedly signed, although it was her contention that the only deed she had intended to sign was the one to the Lenzen place, and that she had not known or realized that she was also signing a deed to the home place.

Defendants joined issue with plaintiff upon the question of whether there had been a lawful delivery of the deeds.

The court found the issues against plaintiff, and in favor of defendants, upon both counts of the petition. In due time plaintiff filed her motion for a new trial, and the same being overruled, she gave notice of appeal, and by subsequent steps has caused the case to be transferred to this court for its review.

The evidence disclosed that on the morning of August 1, 1952, plaintiff went to the bank and enlisted Heil's assistance in the preparation of either a deed to the Lenzen place alone, or of deeds to both the Lenzen place and the home place, depending upon whose version of the facts is to be believed. Plaintiff testified that all she asked of Heil was that he make out a deed conveying the Lenzen place to Edward, and that she did not mention the home place at all. On the other hand, Heil testified (after prefacing his statement with the qualification that it had been "quite some time ago") that, as he recalled the incident, plaintiff had wanted deeds prepared whereby she would deed a part of her property to Edward and Jane, and another part to Pierce and Charles (for the lifetime of each) and then to Edward and Jane, subject in each instance to the retention of a life estate in herself.

Heil testified further that plaintiff brought along with her "some old deeds or abstracts or something" from which he might obtain a description of the property to be conveyed, and that he had not had possession of any other of her papers or had access to her box in the bank. Plaintiff denied that she had taken any papers to Heil on the morning in question, but stated that she had taken her deed and abstract to him on a previous occasion, and remembered giving them to him to put in her box.

It appears that Heil had been too busy to comply with plaintiff's request immediately, but some time later had a stenographer type the deeds from notes he had allegedly taken down during his conversation with plaintiff, and then in the afternoon called plaintiff at the home of friends where she was waiting and informed her that things were ready for her signature. She thereupon returned to the bank and admittedly signed two separate papers, but gave as her explanation for signing two papers that inasmuch as she had asked for the preparation of but the single instrument, she had assumed that the two papers together constituted the deed to the Lenzen place. She testified that before she signed the papers Heil read "something" to her, and later in her testimony stated more specifically that Heil read one paper to her, which she informed him was exactly as she wanted it. She had no recollection of him reading a second paper. Heil testified for his part that he read both deeds to her, and that when she expressed her satisfaction with them, he had her sign them and then took her acknowledgment as notary public. He testified further that since he and plaintiff had gone over the whole matter in the course of their conversation in the morning, he did not recall having explained the entire transaction again when she returned to the bank in the afternoon.

As for the vital question of what occurred or was said after plaintiff had sign-

ed and acknowledged the two deeds, she testified repeatedly that she left the papers with Heil with instructions to keep them until she called for them, and that he assured her that he would. She was positive in her testimony that she did not tell Heil on that occasion to deliver what she thought was but the one deed to any one, or to arrange for having it recorded.

The only two people who were in a position to know what transpired in connection with this precise feature of the case were plaintiff and Heil, and actually Heil's account of the incident was not greatly different from that which plaintiff herself had given. The chief variation appearing in his version of the facts was that after plaintiff had signed and acknowledged the deeds, she stated that she wanted him to handle the whole thing for her. However in his deposition taken some months prior to the trial, he had testified that she had told him to keep the deeds; and when asked on the stand whether she had given him any directions about recording the deeds, his answer was, "I don't recall that she told me those exact words, no". He definitely admitted that she had not told him to deliver the deeds to any one of the named grantees.

It appears that after plaintiff left the bank, her nephew, Edward, drove her out to her home and in the course of the trip engaged her in certain conversation regarding the making of the deed or deeds. Edward testified that she told him she had made the deeds and that Heil was handling the whole thing for her, and that when he inquired if she had filed them, she replied, "Well, he knows what I want, he knows how to do that, he knows what I want done." Plaintiff testified that Edward knew that she had made "a deed", but professed ignorance as to how he had learned of it unless Heil had called him up and told him. She denied having said that she wanted to have the deed or deeds recorded, but recalled his having told her that whatever she had signed would be worthless unless she did have it recorded.

Although Edward made no pretense that plaintiff had requested him to get possession of the deeds and have them recorded, he nevertheless took it upon himself to do that very thing shortly after the bank opened the following morning. Heil testified that Edward happened into the bank, and that knowing that Edward was on his way to Carrollton, the county seat, he asked him if he would file the deeds. Edward's own testimony was to the same effect. The deed to the home place was filed for record at 10:20 o'clock that morning, and the deed to the Lenzen place at 10:25 o'clock. Upon reaching Carrollton, and before he had taken the deeds into the recorder's office, Edward encountered one Jim Beams, whose nephew, Dale Beams, issued a weekly publication which listed all deeds that had been recorded during the previous week. According to Edward's own account of the incident, he told Jim Beams that he had some deeds, and inquired if it would be possible "to leave them off the transcript" for the reason that "this woman was concerned that somebody would know about her business, and particularly her brother". When Beams replied that such an omission would be neither customary nor fair to his subscribers, Edward allegedly stated that it made no difference to him personally; and in due course the two deeds were shown in the transcript along with all others that had been recorded during the same period.

There is some confusion in the testimony regarding the subsequent sequence of events, but it would appear that some few days—perhaps as much as a week—after plaintiff had signed the deeds, she paid another visit to the bank and not finding Heil in, left a signed blank check with one of the employees with directions to turn it over to Heil to pay the fee for having what she thought was merely the one deed recorded. About a week later she returned again to the bank, and according to her testimony, told Heil that Edward would be going up to Carrollton, and that the deed could be sent along with him to have it recorded. It was then that Heil informed her that the deeds had already been

recorded and the filing fee paid, and gave her back her check which she had left with one of the employees on her previous visit.

Apparently the transaction caused some comment in the community, and when plaintiff heard statements that a deed to the home place had been recorded, she went with a friend to the recorder's office and found it to be true that a deed to the home place as well as one to the Lenzen place had been filed for record. She proceeded at once to take steps to correct the situation with respect to the conveyance of the home place, and had a deed prepared by her attorney whereby Pierce, Charles, Edward, and Jane, the grantees in her own purported deed to the home place, would convey the home place back to her.

Pierce had meanwhile entered a hospital for what proved to be his last illness, and when he was thus rendered unable to look after plaintiff's personal wants as he had always done in the past she accepted assistance from one John Adams, who had lived as a tenant on the home place for some 12 years, but who had actually worked for the Cleary family for 30 years. As a matter of fact, as early as September 3, 1952, assuming that she still owned the home place, she had gone to Heil and had him prepare a deed conveying the home place to John Adams and Mary Elizabeth Adams, his wife. Heil admitted that he had interposed no objection to her request, although he was aware at the time that only a month before, he had prepared deeds conveying all her property which had been both signed and recorded.

The deed to Adams was never signed by plaintiff for the reason, apparently, that she was unsuccessful in her attempt to have title to the home place restored to her. Pierce signed the deed which had been prepared for the accomplishment of that purpose, but Charles refused to sign when he was informed of plaintiff's intention to convey the home place to Adams for whom he displayed a very pronounced dislike while he was on the stand. Following Charles' lead in the matter, Edward also refused to sign.

At this turn of events the present suit was instituted on October 22, 1952.

We observe that on the very threshold of the trial there was some misgiving as to whether the proceeding was at law or in equity. As a matter of fact, a jury was selected but then discharged before the taking of evidence had begun. It was perhaps thought at the outset that the fact question of whether the deeds had been delivered presented nothing but a question of law. However court and counsel very properly recognized that there was more to the case than this. A prayer that a deed be set aside and for naught held is synonymous with a prayer for its cancellation; and the remedy of cancellation is peculiarly a matter of equitable cognizance. Swain v. Maxwell, 355 Mo. 448, 196 S.W.2d 780; Morris v. Hanssen, 336 Mo. 169, 181, 78 S.W.2d 87, 93. In this case legal title to the lands is vested in defendants by the deeds in question; and the ultimate purpose of the suit is to cancel such deeds, which, so long as they stand, constitute barriers in the pathway of asserting the title which plaintiff claims she has never relinquished. Not only is plaintiff's remedy in equity, Peters v. Berkemeier, 184 Mo. 393, 83 S.W. 747, but the relief she seeks—that the deeds be set aside and title be vested in her—involves title to real estate in a constitutional sense so as to confer exclusive appellate jurisdiction on this court. Const. of 1945, Art. V, § 3 V.A.M.S.

Plaintiff argues that the court erred in finding against her, and in favor of defendants, on each count of the petition for the reason that under the evidence, as plaintiff views it, there was no valid delivery of either of the deeds.

We do not understand that there is any disagreement between the parties over the law relating to the general subject of the delivery of a deed.

Suffice it merely to say on this score that it is essential to the validity of a deed that it be delivered with intent to pass immediate title to the grantee. In

other words, it is delivery which gives the instrument force and effect; and to establish delivery the grantor must part with dominion and control over the deed with the intent that it shall become operative and effectual in the present. The essence of delivery, and the controlling element, is the grantor's intention, which may be manifested by words or acts or both; and where, as here, the case turns upon the question of whether there was a delivery, the burden of showing nondelivery rests upon the party who seeks to invalidate a deed upon such ground. Reasor v. Marshall, 359 Mo. 130, 221 S.W.2d 111; Klatt v. Wolff, Mo.Sup., 173 S.W.2d 933; Forster v. Clark, 351 Mo. 59, 171 S.W.2d 647; Rone v. Ward, 357 Mo. 1010, 212 S.W.2d 404; Galloway v. Galloway, Mo.Sup., 169 S.W.2d 883; Dallas v. McNutt, 297 Mo. 535, 249 S.W. 35; 26 C.J.S., Deeds, § 40 et seq.; 16 Am.Jur., Deeds, Sec. 110 et seq.

■ This being a suit in equity, the appeal brings it here for trial de novo upon the record made up in the lower court. In the performance of this function it therefore becomes our duty under well-established rules of procedure to weigh the evidence for ourselves and reach our own conclusions on the facts. In this character of appeal we are triers of the facts as well as of the law, and are in no sense bound by the findings of the lower court, although out of necessity and convenience, and in recognition of that court's more favorable opportunity to determine questions of credibility, we will be inclined to defer to it in instances where sharply conflicting oral evidence does not greatly preponderate one way or the other. Nevertheless it is our primary responsibility to make our own determination of the facts, and we will not hesitate to make findings differing from those of the lower court where our own examination of the evidence impels the conclusion that the lower court's findings were clearly wrong. Edinger v. Kratzer, Mo.Sup., 175 S.W.2d 807; Edmonson v. Waterston, 342 Mo. 1082, 119 S.W.2d 318; Ahern v. Matthews, 337 Mo. 362, 85 S.W.2d 377.

In considering the question of whether there was a valid delivery of the deeds, much of the evidence is equally pertinent to both counts of the petition. However there is one feature of the evidence which is not only limited in its application to the first count of the petition, but which is of itself decisive of the claim asserted in such count. This is the evidence relating to the question of whether plaintiff, irrespective of any other consideration in the case, had in fact intended to execute the deed to the home place.

As we read the record, the weight of the evidence decidedly supports plaintiff's insistence that she had no such intention, and had actually not been aware that such a deed had been written up and signed until she made her investigation in the recorder's office.

■ Plaintiff was as positive as could be in her testimony that all she had wanted Heil to prepare was a deed to the Lenzen place, and that she had not said anything to him about the preparation of a deed to the home place. While we have no reason to doubt Heil's sincerity in his assuming that she desired to have a deed prepared to the home place as well as to the Lenzen place, the evidence points strongly to the conclusion that such assumption on his part was due to misunderstanding of what her actual wishes were. It is a highly significant fact that he was busy at the time—too busy in fact to stop and prepare whatever it was she desired; and it would appear that in his hasty discussion with her over her affairs with which he was of course entirely familiar, he mistakenly took it for granted that she wished to dispose of the home place by deed in the same manner that she had previously made provision for its disposition by will.

Had plaintiff understood that she had conveyed the home place to the grantees named in the deed, she would undoubtedly have realized that she could not thereafter convey the same property to John Adams and his wife; nor if she had known of the execution of such a deed, would there have been

any reason for her to have been surprised to the point of making a personal investigation at the recorder's office when she became aware of the gossip that was making the rounds of the community. It is most persuasive of her lack of intention to dispose of the home place that upon learning that a deed to the home place had actually been put on record, she immediately consulted an attorney and had a deed prepared by which the home place would be reconveyed to her. Whatever the circumstances may have been that prompted Heil to prepare a deed to the home place along with one to the Lenzen place, the evidence is most convincing that plaintiff had no intention of making such a conveyance, and for this reason apart from any others she may not be held to have consented to the delivery of the deed.

Since plaintiff had admittedly requested the preparation of a deed to the Lenzen place and had then admittedly signed and acknowledged such a deed, the question of whether she had also intended to have it delivered must turn upon entirely different considerations from those we have discussed in connection with the validity of the deed to the home place.

Again plaintiff's testimony was unequivocal that all she had asked of Heil was to keep the deed until she called for it, and that she had not given him any directions to have it recorded. Indeed, anxious as he must have been to have his conduct justified, all that he could say was that she had requested him to handle the whole thing for her, which he took to mean that she wanted him to proceed with the additional step of having the deed recorded, although he admitted that she had given him no such specific order.

■ Beyond all this, the circumstances surrounding the transaction lend strong support to the idea that even though plaintiff had intended to sign the deed, she had not intended that it should presently become operative and effectual as a transfer of title to Edward and Jane. If she had meant what Heil took her to mean, there would have been no point in Edward's advice to

her later in the afternoon to have the deed recorded. On the contrary, the very fact that he felt called upon to give her such advice could only indicate his own belief from what he had learned of the transaction that she had a different intention at the time. Neither did she authorize him to obtain possession of the deed the following morning, but instead Heil's act in handing the deed over to Edward was concededly something with which plaintiff herself had nothing to do.

Moreover plaintiff's own actions in the week or so that followed her signing of the deed were inconsistent with the theory that she had intended for Heil to have the deed recorded when she handed it back to him after he had taken her acknowledgment of it. If so, she would undoubtedly have arranged for payment of the recording fee that same afternoon rather than postpone the matter for a week; and certainly she would have been expected to suggest to either Heil or Edward, if not to both of them, that Edward should take the deed down to the recorder's office. Of course she did eventually decide to have the deed recorded and then proposed that Edward be entrusted with the task, but under all the facts and circumstances in the case we cannot escape the conclusion that she had no such intention on the morning of August 2nd when Edward came into possession of the deed.

The truth of the matter is that defendants must have their own misgivings about the justification for holding that plaintiff had intended for the deed or deeds to become immediately operative and effectual inasmuch as here in this court they for the first time suggest that they should prevail upon the ground that plaintiff afterwards ratified what had been done.

■ The law does seem to be that even though a delivery is not authorized or intended by the grantor, yet he may by his subsequent conduct ratify an unauthorized or unintended delivery where he acts with knowledge of all the facts. 26 C.J.S., Deeds, § 50; 16 Am.Jur., Deeds, Sec. 118.

Under the evidence in this case, any claim of ratification would have to be limited at most to the question of the possible making good of the delivery of the deed to the Lenzen place. However we need not pursue the matter further since actually there is no issue of ratification in the case. The theory of ratification necessarily presupposes an unauthorized delivery, while here the pleaded defense, and the evidence in support of it, were all to the effect of an authorized delivery. It would be manifestly contrary to all the rules of appellate practice to undertake to sustain a judgment upon a theory not only different, but in fact inconsistent, with that applied in the lower court.

It follows that the judgment of the circuit court should be reversed and the cause remanded with directions to the circuit court to enter judgment in favor of plaintiff, and against defendants, granting plaintiff the relief she seeks in both counts of the petition.

It is so ordered.

LEEDY, Acting P. J., ELLISON, J., and BROADDUS, Special Judge, concur.