Marthalea Montfort POPE, Respondent,

v.

Wendell COX, Appellant,

and

Homer Brumley, David Brumley, Caroline Brumley and the Security Bank of Branson, Defendants.

No. 52499.

Supreme Court of Missouri,
Division No. 2.

Sept. 11, 1967.

Neale, Newman, Bradshaw, Freeman & Neale, Flavius B. Freeman, Jerry L. Redfern, Springfield, Peter Rea, Branson, for respondent.

Marvin Motley, Branson, for appellant.

STOCKARD, Commissioner.

By her petition, in two counts, plaintiff sought to quiet title to certain land in Taney County, Missouri, and to cancel and have declared void an option in favor of defendant to purchase plaintiff's interest in the land. By his pleadings defendant sought specific performance of the option to purchase, and if successful to partition. The trial court held the option to be of no effect, and denied defendant's request for specific performance, and defendant has appealed. Appellate jurisdiction is in this court. Beets v. Tyler, 365 Mo. 895, 290 S.W.2d 76.

Plaintiff was the owner of an undivided five-ninths interest in a tract of land containing approximately 160 acres, known as the Montfort homestead, where she had lived for many years. However, for seven months in 1964 she rented and operated a cafe and beer tavern, living in a small back room of the building, located north of Branson on Highway 65, and known as the Skyline.

Defendant was a clothing salesman who had recently moved into the area and purchased 100 acres of land adjoining plaintiff's land upon which he operated or planned to operate a rodeo. He had become acquainted with plaintiff during the latter part of July or the first part of August, 1964, when he stopped at the Skyline. He testified that about September 21 plaintiff called him and wanted to borrow $150 to make a down payment on a trailer. Although defendant had known plaintiff for only a short time he agreed to loan her the money because, in his words, he "wanted to get better acquainted with her" and thought that "later on" he might be able to purchase plaintiff's interest in the Montfort homestead. Defendant went to Mr. Marvin Motley, his attorney, gave him a check for $150 and instructed him to obtain that amount of cash and take it to plaintiff and have her sign a note due in 60 days. On September 23 Mr. Motley took the money to plaintiff at the Skyline and obtained her signature on the note. Mr. Motley testified that plaintiff asked him if defendant would loan her additional money, and that she said she wanted the money because she owed $500, she had purchased the trailer, she had "a number of insufficient checks in Moberly," she was on a "cash basis with the beer people," and she was tired and would like to get away and take a vacation. This request was communicated to defendant by Mr. Motley. Thereafter on September 24 or 25 defendant had two conversations with plaintiff at the Skyline. According to defendant, plaintiff said she wanted to borrow "around $2,000 at

that time" so she could take a trip to Nevada and pay some debts. Defendant told plaintiff that he "would give her the money if she would give [him] an option to purchase the property [Montfort homestead] and also a mortgage," and that he made her a "firm offer" of $4,500 for her fractional interest. He later directed Mr. Motley to prepare forms of an option to purchase, a note, and a deed of trust. On September 28 defendant went to the Skyline and plaintiff signed the option to purchase. She stated that she could not leave the Skyline so she called Foster Plummer, a notary public, on the telephone, told him she had signed the option, and asked that he notarize her signature. Apparently she did not sign the note and deed of trust at this time. Defendant took the option to Mr. Plummer who signed as notary, and the instrument was delivered to Mr. Motley. Defendant testified that when the option was signed by plaintiff they were in a booth at the Skyline, and in his opinion "she was perfectly sober," there was no evidence that she had been drinking, and her ability to answer questions was "fairly good."

An error was discovered in the description of the land as set forth in the option. Defendant does not claim any rights by reason of this option agreement. Later during the day of September 28, defendant returned to the Skyline with a new option agreement, a form of a note in the amount of $2,000, and a form of a deed of trust. He took with him Mr. Boyd Fitch, a notary public. They met with plaintiff in a small room at the back of the Skyline which defendant described as a combination office and bedroom. At the time plaintiff was dressed in a robe. Defendant testified that he and Mr. Fitch were there forty-five minutes to an hour, and that plaintiff signed the three instruments, and that Mr. Fitch acknowledged her signature on the option and deed of trust. According to defendant, plaintiff "looked at each document" and said, "I know about these papers, I have been in-

structed by Mr. Motley what they contain, I don't need to read them clear through." Defendant testified that plaintiff did not drink anything while he was there, and that he did not see anything to drink. Plaintiff wrote a note on a portion of a cigarette carton, which defendant testified was a message to Jim Owen "advising him that I could have the pasture on the farm for my livestock." This was not, however, what the note said. It was as follows: "I want Wendell to get the key from you Jim, he's going to [the word appears to be 'finally'] clean the spring to use it, let him in, it's all his!! Monty!!" Defendant gave plaintiff a check in the amount of $1,850 for the $2,000 note, and he explained that the difference represented the $150 he had previously given her for the trailer. Plaintiff gave the check back to defendant and told him to give it to Mr. Motley to deposit to her account in the Security Bank.

Mr. Fitch testified that there was "quite a conversation" as to the contents of the documents, and that plaintiff examined them before signing. He stated that he had heard that plaintiff was a "drinker," but that her physical condition appeared "normal in respects of the human being," and that there was nothing about her conduct that raised any question as to whether he should take the acknowledgments.

Plaintiff testified that she was 43 years of age, married but separated from her husband, and that for seven months she lived at and operated the cafe and beer parlor known as the Skyline. She described herself as a "drinker" and as a "blackout drinker," and she stated that it takes "two drinks to black [her] mind out." She stated that a "blackout drinker" is one who "can go ahead drinking yet function but * * * just don't remember anything." She further stated that she was a member of alcoholics anonymous, and that previously she had been treated many times for acute alcoholism. She admitted that she had talked to defendant about an option before September 28, but she said that she thought an option meant that if she decided to sell "he would be first in line to buy." She could not remember if defendant told her the purpose of an option to buy, but that she "took it for granted the option would be all over and done with when I paid my debt." According to plaintiff she had not been drinking for seven months prior to September 21, but on that day which was her birthday there was a party for her and she went "off the wagon," and thereafter until she entered a hospital on October 21 she was "blind drunk," and was drunk on September 28 and could not remember anything that happened that day. She identified her signature on the option agreement, but described it as a "very sloppy signature" and as her "drunken signature." She identified another signature written on March 8, 1966, as her "normal signature" when she was "in [her] right mind." A comparison of these two signatures does reveal a substantial difference. Plaintiff further described herself as a "sporatic drinker," and stated that when she starts to drink she "will do anything to get it" and "would sell my eyes probably." Plaintiff asserted that she never intended to sell her property, and when asked if she could remember whether she received $150 for the option, she said that she could not remember anything after September 21, and did not recall signing the deed of trust. On cross-examination plaintiff admitted that in September of 1964 she was in a bad financial condition and needed money.

Mr. Les McCord, the state liquor control agent for Taney County, visited the Skyline "two or three days" after plaintiff's birthday. Plaintiff was in bed, was in the process of drinking a bottle of beer, there were empty bottles around the room, the "whole place" smelled of alcohol, and in his opinion she was "on an extended drinking period," but she responded to questions and gave intelligent answers. He did not know her condition on September 28.

Mr. Kenneth Nickens worked at the Skyline as a cook. He testified that plaintiff "*got drunk*" after the birthday party and stayed drunk, and that she was drunk on September 28 when she signed the papers, but he was not in the room at the time she signed.

Mrs. Lois Clark worked at a cafe in Branson, and was a member of alcoholics anonymous. She visited plaintiff as an alcoholic and took her to meetings on Monday nights for almost a year. In the fall of 1964 plaintiff had been sober for almost seven months, but it was then reported to Mrs. Clark that plaintiff was drunk. She visited plaintiff eight to ten times in September, and visited her several times toward the end of September. In her opinion plaintiff was "not only in the state of complete exhaustion she was also I would say in a mental blackout," and she was "in a blackout for a period of six or seven weeks from the time [she] saw her" and until plaintiff's mother died in October.

Mr. Donald Lee Conner also worked at the Skyline, and was working there on September 28 when defendant and Mr. Fitch were there that evening. At that time "she [plaintiff] was drunk" on beer. He remembered that Mr. Motley was there on September 23, and in his opinion plaintiff was drunk at that time. Neither on September 23 nor on September 28 did he caution Mr. Motley or defendant that plaintiff was drunk.

Plaintiff was admitted to the Skaggs Community Hospital on October 21, 1964. She had gone to the hospital to visit her mother, who was seriously ill and who died that day. The notation on the hospital record was that plaintiff "seemed to be near collapse, so was put to bed by nurses." She stayed in the hospital one week. She later closed the Skyline, and one of the reasons for doing so, according to plaintiff, was that Mr. McCord told her that she "had better get off of it," apparently referring to her drinking, and had asked her

"if [she] wouldn't please go ahead and [close] it."

Plaintiff offered in evidence certain statements made by defendant in his deposition in which he said that he did not read or explain the option to plaintiff; that Mr. Fitch did not read to plaintiff "the contents of the whole option;" that he did not "think that [plaintiff] went through it all;" and that he replied "I don't know" when asked if it was "possible that [plaintiff] could have been intoxicated."

There was a substantial difference in the testimony of the value of the property. Generally stated, plaintiff's evidence from expert witnesses was to the effect that the 160 acres was worth $16,000, and defendant's evidence from expert witnesses was that it was worth $60 an acre or $9,600. Defendant testified that the reasonable value was between $6,500 and $8,000.

At the time of the trial the note in the amount of $2,000 had been paid and the deed of trust released, and plaintiff offered to return the $150 paid by defendant for the option to purchase.

The trial court held the option to purchase "should be and is held to be of no force and effect and is void" because (1) plaintiff "was intoxicated from the use and consumption of alcoholic beverages and that intoxication was so deep and excessive as to deprive the plaintiff of her understanding and that her ability to understand and comprehend the legal significance of her act and the contents and legal significance of the said option was impaired and that due to said intoxication at the time of the execution of said option plaintiff was unable and incapable of assenting to said option," and (2) "the consideration paid for said option and the consideration offered for said lands was and is grossly inadequate and far below the value of the property and as such was and is unfair and insufficient."

Defendant contends on this appeal that plaintiff has not met her burden to show by clear, cogent and convincing evidence that (1) by reason of intoxication she did not have the mental capacity to execute the option to purchase, and (2) the consideration paid for the option and the consideration offered for the land was grossly inadequate.

■ In this equity action we review the case upon both the law and the evidence, and we determine the credibility, weight and value of the oral testimony and other evidence in the case, but in doing so we give due deference to the trial court's findings, and we do not set aside the judgment unless it is clearly erroneous. Long v. Kyte, Mo., 340 S.W.2d 623. Defendant argues that this rule of deference does not relieve us of our primary responsibility to make our own determination of the facts, citing Cleary v. Cleary, Mo., 273 S.W.2d 340, 341, 346, and we agree. However, when there exists sharply conflicting oral testimony, our determination of the facts involves a certain degree of deference to the findings of the trial court who heard and observed the witnesses.

Defendant does not challenge the general rule, relied upon by plaintiff, that intoxication to such a degree as to deprive one of his reason and understanding, that is, that he is incapable of comprehending the nature and consequences of his act, constitutes grounds for equitable relief from the terms of a contract made while in that condition, even though the intoxication was voluntary. See Masterson v. Sheahan, Mo., 186 S.W. 524; Haneklau v. Felchlin, 57 Mo.App. 602; Miller v. Chinn, Mo.App., 203 S.W. 212; 17 C.J.S. Contracts § 133(2); 26 C.J.S. Deeds § 54f.

■ The evidence establishes that plaintiff was an alcoholic, and that when she started drinking she would continue to drink but would still be able to "function" in that she would be able to talk and move around. Her testimony was to the effect that she was a "blackout drinker" in that she could not remember, or could remember only imperfectly, what occurred when she was under the influence of alcohol. She also testified that she "fell off the wagon," that is, started drinking, after her birthday party on September 21, and that she remained drunk or under the influence of alcohol until admitted to the hospital in October. This was supported by the testimony of Mr. McCord, the liquor control agent who was a disinterested witness. He testified that in his opinion (and no objection was made to his qualification to express an opinion) when he visited plaintiff shortly after her birthday that she had been on "an extended drinking period." Mrs. Clark, also a disinterested witness, supported plaintiff by her testimony that during the latter part of September plaintiff was in a state of exhaustion and in a "blackout" by reason of the use of alcohol. As to this opinion there was no objection. While neither of these witnesses could state precisely plaintiff's condition on September 28, this testimony does support plaintiff's contention in that plaintiff's condition was shown to have been one which continued over a period of time. See Rogers and Powers v. Warren, 75 Mo.App. 271. Two former employees supported plaintiff by their testimony that plaintiff became drunk after her birthday, remained drunk, and was drunk on September 28 when she signed the option to purchase. We also have the testimony of plaintiff that she was in need of money at the time, and that when drunk she would do almost anything to obtain alcoholic beverages. While plaintiff's testimony as to this latter characteristic may not be given particular weight, it is a recognized fact that one under the influence of alcohol is inclined to exercise poor judgment in business as well as other matters. In addition to the above, there is the circumstance that on October 21, plaintiff was admitted to the hospital under circumstances indicating a long period of drinking which was consistent with her history of being an alcoholic. This testimony

clearly supports the conclusion and findings of the trial court that plaintiff was so intoxicated when she signed the option to purchase as to deprive her of her ability to understand and appreciate the legal significance of her act.

In contrast to the above we have the testimony of defendant, Mr. Motley and the notary public. Mr. Motley saw and talked to plaintiff on September 23 and on two other occasions within the next day or two. Plaintiff appeared to him to be sober, although on one occasion she was drinking a beer. Both defendant and the notary public, whose interest in the case must be considered (as is also the case with the testimony of plaintiff), stated that plaintiff did not appear to them to be drunk. We note though that with considerable less confidence than that indicated by his testimony at the trial, when defendant was asked on deposition if it was possible that plaintiff could have been intoxicated when she signed the option agreement, he replied that he did not know.

We doubt that the evidence of the value of the land would authorize the conclusion that the amount to be paid was so grossly inadequate that, standing alone, it would justify setting aside the option. However, the evidence does indicate that the contract price was substantially below the actual value. This fact can and should be taken into consideration in determining whether by reason of the use of alcohol plaintiff was at the time so intoxicated that she was not able to appreciate fully the legal significance of her act.

When we consider all of the evidence and the circumstances, and consider the oral testimony of all the witnesses and weigh it with their interest or lack of interest in this case, and when in making our determination of the facts we give due deference to the findings of the trial court made after an opportunity to observe and hear the witnesses, an opportunity we do not have, we are constrained to reach the same conclusion as did the trial court that

at the time plaintiff signed the option agreement she was under the influence of alcoholic beverages to such an extent that her ability to understand the legal significance of her act was substantially impaired.

The judgment is affirmed.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.