Rose Marie CRAFT, Individually and as Executrix of the Estate of C. Monte Craft, Deceased, and Katherine Evens, a/k/a Esther Catherine Evens, Appellants,

v.

Gentry R. POLITTE and Georgetta Politte, his wife, d/b/a Politte Funeral Home, Respondents.

No. 54704.

Supreme Court of Missouri, Division No. 1.

May 11, 1970.

Motion for Rehearing or for Transfer to Court En Banc Denied June 8, 1970.

J. Richard Roberts, Nicholas G. Gasaway, Dearing, Richeson, Roberts & Wegmann, Hillsboro, for plaintiffs.

Thurman, Nixon, Smith & Howald, Jeremiah Nixon, Hillsboro, for respondents.

HOUSER, Commissioner.

On March 17, 1967 Monte Craft brought an action in equity against Gentry R. and. Georgetta Politte, d/b/a Politte Funeral Home, in three counts. Craft died before the case was tried. The action was revived in the name of his widow Rose Marie, individually and as his executrix, and his daughter Esther Catherine Evens, both of whom under his will have an interest in all property left by him. This is an appeal from the chancellor's decree finding for defendants on all three counts.

Plaintiffs alleged in Count I that at the instance and·request of defendants, Monte Craft purchased certain real estate in Festus for conversion to a funeral home to be used by defendants in the operation of defendants' funeral business; that defendants, using money advanced by Craft, completed reconstruction and rebuilding of the improvements; that Craft advanced a total of $66,607.45 for the real estate, expenses of reconstruction, taxes and insurance; that prior to the purchase and the making of these advances defendants promised to

repay Craft for all amounts advanced and expended and to give Craft security on the real estate after the same was transferred to defendants; that relying upon the promises of defendants Craft conveyed the real estate to defendants but that defendants, although requested, have failed to secure the payment of the debt by the execution of a note and deed of trust or otherwise, but have merely paid Craft $175 per month for a total of $12,250. The prayer was for specific performance of the alleged contract and an order on defendants to execute and deliver their promissory note for $66,607.45 plus interest and a deed of trust to secure payment of the note.

In Count II plaintiffs realleged the allegations of Count I and further alleged that defendants have refused to recognize Craft's interest in the property and that plaintiffs are without an adequate remedy at law. The prayer was for a decree enforcing a resulting trust in the premises, declaring defendants trustees of the property for plaintiffs; setting aside the deed from Craft to defendants, for an accounting of rents and profits "and for such other and further relief as to the Court may seem fit and proper."

In Count III plaintiffs realleged the allegations of Count I, and further alleged that by reason of these facts defendants are justly indebted to plaintiffs in the sum of $66,607.45 and prayed for judgment in that sum plus interest.

Defendants denied generally, pleaded the statutes of frauds and limitations; set up the deed from Craft to defendants as a complete release of all claims to the premises; alleged that any payments made by Craft were voluntary and as a gift, and alleged that the agreement was that defendants pay Craft $175 a month for and during his life and that defendants have performed their part of the agreement.

The trial chancellor made a general finding for defendants on each of the three counts without making any specific findings of fact or disclosing the basis upon which the court acted.

On this appeal plaintiffs do not contend that they are entitled to specific performance, or a decree enforcing a resulting trust. They have abandoned Counts I and II. Plaintiffs' third pleaded theory of recovery (Count III) was that of debt. Plaintiffs seek a judgment in this Court impressing an equitable lien upon the property for the amounts advanced and expended by Craft, which they fix at $70,018.22 plus interest, less the amounts paid by defendants ($12,950). They assert that there was an oral contract to repay, and assert their right to an equitable lien under the broad powers of a court of equity and under the prayer for general relief in Count II.

Specifically, plaintiffs charge that the court erred in finding that there was no parol agreement on the part of defendants to reimburse Craft, and in finding that plaintiffs are not entitled to an equitable lien in the property, claiming that "the remedy of one whose monies have been used in the purchase and improvements of real property without security is by impressing an equitable lien." Plaintiffs further seek to show that the adverse ruling could not properly have been made on the theory that Craft made a gift of the property to defendants, or on the basis of the defenses of the statutes of frauds and limitations.

■ In an equity action we review the entire record upon both the law and the evidence, determining the credibility, weight and value of the oral testimony and other evidence in the case, and making our own determination of the facts. In so doing we give due deference to the findings of the trial court when proper and do not set aside the judgment unless clearly erroneous. Pope v. Cox, Mo.Sup., 417 S. W.2d 929; Tinnon v. Tanksley, Mo.Sup., 408 S.W.2d 98.

Both sides agree that there was an oral agreement between Craft and the Polittes but they disagree as to the terms of the agreement. Craft, who testified by deposition shortly after suit was filed, related that the Polittes had agreed to reimburse him for all outlays made by Craft for the purchase of the property and for the cost of reconstruction; that Craft was satisfied at first to accept $175 a month because the Polittes were not then financially able to pay more but after a couple of years he felt that he should have more; that the Polittes agreed "to do something about it" —"to fix something up" and "get it straightened out" but that nothing in addition to the $175 monthly payments ever materialized. The Polittes on the other hand testified that Craft agreed to buy and pay for the property and improvements; that Craft wanted the property to be that of the Polittes, who agreed to pay Craft $175 a month for the remainder of his life, but that there was no agreement for total reimbursement or to give Craft a promissory note or a deed of trust on the property. Our review of the whole record leads us to the same conclusion reached by the trial chancellor. We are fully satisfied that the testimony of the Polittes, as corroborated by the Polittes' son, and their son-in-law and Craft's lawyer, truly reflects the agreement of the parties, and that Craft's testimony as to the terms of the agreement should not be accepted. Accordingly, we find the facts to be as follows:

Monte Craft was married three times. His first wife died shortly after the birth of his only child, Esther Catherine. His second wife, Pauline, sister of defendant Gentry R. Politte, died in 1959. He married his third wife, Rose Marie, in 1963, and lived with her until his death on July 11, 1967.

There was a very strong attachment between Pauline and Gentry. Pauline, who was 11 years his senior, took care of Gentry after the death of their mother, which occurred when Gentry was 12. When Pauline and Craft were married Gentry at their request was excused from classes at high school to "stand up with them." Craft was a successful farmer and resort operator. Pauline taught school to supplement their income. Craft and Pauline encouraged the Gentry Polittes to move from Illinois to Crystal City in 1937, and enabled them to get into the funeral home business by lending them $2,500 cash to finance the transaction. Gentry and his parents signed a note evidencing this loan, and the Polittes paid the interest on this note. A warm, close personal relationship developed between Craft, Pauline, Gentry and Georgetta. Having started Gentry in business, Craft and Pauline were anxious to see that he made good in business, and "helped him in every way that was humanly possible." The Monte Crafts, childless, lavished their affection on the Polittes and the Politte children. In 1944 Craft loaned Gentry $1,800 with which to buy three lots adjacent to his funeral business. Gentry signed a note and deed of trust, but Craft waived interest on this note. In 1949 Craft loaned Gentry $20,000 with which to purchase a funeral home in Festus, taking a note and chattel mortgage on the personal property. Thereafter Gentry operated two funeral homes. The chattel mortgage was never recorded. After the Polittes had repaid $15,000 on this loan Craft waived the balance due. Craft loaned Gentry $5,000 on property purchased by Gentry in Herculaneum and later made a gift to the Polittes of the note and deed of trust evidencing that loan, marking it "paid in full." In 1954 the Crafts sold their resort property and moved to Crystal City in order to be near the Politte family. The families visited in each others' homes, had reunions on birthdays and holidays, ate together, and the menfolk hunted and fished together. Craft worked at the funeral home, spending much of his time there. Gentry offered to pay Craft for his services but Craft refused to accept payment. Craft expressed his affection for the Polittes; considered them the same as his children, and in his retirement wanted to

be of assistance around the funeral home in order to help them.

In 1960 Gentry did not own, but was paying $175 a month rent for, the building housing the funeral home in Festus. Craft became interested in purchasing property for a new location of the funeral home in Festus. Craft "wanted the finest funeral home in Jefferson County." He looked at several properties and discussed the matter with the Polittes. The latter at that time were out of debt, doing well, and were not interested in buying property and going in debt. Craft had always admired the Brickey property and it was for sale. He wanted to buy it and he told the Polittes that the purchase of the Brickey property was "the thing to do"; that if they would pay him $175 a month as long as he lived "that would satisfy him," and at his death the property would belong to Gentry and Georgetta; that he had other income and would be more than satisfied to get this $175 a month for the rest of his life. Craft agreed to pay the expense of extensive remodeling, which was needed to convert the property into a funeral home. Craft did not enter into this transaction with profit as a motive but with a sincere desire to help the Polittes, as he had done over the years. On March 21, 1960 Craft purchased the Brickey property, paying $20,441.75 for it, and took a warranty deed in his own name. Thereafter extensive repairs and additions were made to the building, at a cost of $45,000. Craft participated in the making of decisions and suggestions during the progress of the work. Payments for the repairs and additions were made by checks drawn on the Politte account out of monies supplied to the Polittes by Craft. From 1960 to 1964 Craft paid insurance premiums on the property in the sum of $3,184.20, and taxes through 1963 totaling $1,738.27. On June 1, 1961 the Polittes commenced to make payments of $175 a month to Craft. These payments continued through July 1, 1967. A total of $12,-950 was thus paid. Craft did not consider the $175 a month payments as rent and did not report this income as rent on his income tax return. In their 1961 federal income tax return the Polittes set up a 30-year straight line depreciation schedule for an annual depreciation deduction on the property of $1,935.23, based on a value of $58,057.30. The Polittes deducted the same depreciation every subsequent year. Craft did not claim a deduction for depreciation on the property.

On June 21, 1963 Craft brought some papers to Gentry and asked Gentry to go with him to see his lawyer, J. W. Thurman, for the purpose of making over the Brickey property to Gentry and Georgetta. He said he was going to get married and that he wanted this done before he got married because he did not want any trouble after he was married. The two men went to Mr. Thurman's office, where a quitclaim deed to the Brickey property was prepared by the lawyer and executed by Craft, naming the Polittes as the grantees. At the time he made the quitclaim deed Craft was 71 years of age, in good health, and was well-preserved. His parents were long-lived and people "thought he would live to be a hundred." Craft had previously discussed with Mr. Thurman the conveyance of this property to the Polittes. From these previous discussions Mr. Thurman understood that the conveyance was to be without consideration. No mention was made of a deed of trust and no note, deed of trust, mortgage or other writing relating to payment by the Polittes of any money to Craft or security for the money advanced was entered into. Mr. Thurman elected to use a quitclaim deed form rather than a warranty deed because he did not feel that Craft should warrant the title to property for which he was receiving nothing. The deed recited a consideration of "ten dollars and other good and valuable consideration." The deed was recorded by the Polittes on March 3, 1964. On October 2, 1963 Craft married his third wife, Rose Marie, aged 38. He was in good physical and mental condition, attended to his business affairs, and kept all of his records.

Following the marriage Craft spent less time at the funeral home and the two families "got a little further apart." He did not call or visit the Polittes as often as before. When he did come he would tell the Polittes not to tell his wife that he had been to see them. Previous to the marriage Craft had the title to his Cadillac jointly in the names of Craft and Gentry. After the marriage he asked Gentry to sign it back to Craft. On one occasion when Craft was late in arriving at the funeral home to assist in a funeral a call was placed to Craft's home. Rosie was crying. She did not want Craft "to come down." At no time after the marriage to Rose Marie, however, did Craft make demand or request that the Polittes pay more than the $175 a month agreed upon. Beginning with the year 1964 the Polittes assumed payment of taxes and insurance on the property, and on July 14, 1964 the Polittes paid Craft $781 to reimburse him for two insurance premiums he had paid for that year. At the time of his death in July, 1967 Craft was 75 years of age. His will left all of his property to his wife, Rose Marie, for life, and upon her death the remainder interest to his daughter Catherine Evens.

In his deposition Monte Craft denied that he intended that the property go to the Polittes in the event of his death, and denied any conversation with them on the subject. He conceded that Georgetta was not "a hundred per cent for" the purchase of the property; that she did not see how they could pay for it, and that she said if they bought it they would be in debt all their lives. He testified that Mrs. Brickey was not anxious to sell the property to the Polittes because she did not want it to become a funeral home, but that she would sell it to Craft; that it was agreed between Craft and the Polittes that rather than lose the opportunity to acquire the property Craft would buy it and that Gentry could repay him. He stated that at and after the time he purchased the property the Polittes said they would reimburse

him; that they told him to keep track of the cost; that during the remodeling the Polittes told him to keep a record of what he spent and that they would "have to get together some of these days" and figure out what the cost was when completed, "see if we couldn't work something out * * * see if we could fix up something and get it straightened out * * * fix up some papers." He was vague about what kind of papers. Pressed on the matter and asked pointblank if he did not request that they give him a note and deed of trust he said "Yes" but he could not fix the time or tell who was present. At other places in his deposition he testified that there was no understanding at all—no specific agreement—as to how Gentry was to pay him back, or as to when he was to pay him back, and there was no agreement as to any security. He acknowledged that he never did specifically state to them what security he wanted—whether he wanted a note and deed of trust—but merely asked them "to get together" with him to "get the thing straightened out"; that that was the nearest they came to an agreement that there be security in the transaction. Sometimes Craft said "they" (referring to both Polittes) made the agreement, but at one point he did not think that Georgetta was a party to the agreement. Craft testified that he knew the financial condition of the Polittes through the years; that after a couple of years he felt like $175 a month "wasn't getting anywhere" and that he should have more; that he requested increased payments three, four or five times, both before and after his last marriage, but that Gentry always pleaded inability to increase his payments. Craft could not remember ever having executed a deed to the Polittes. His mind appears to have been a blank with respect to the deed. After inspecting his signature and admitting that it looked "very much like" his signature, however, he would not deny executing the deed. He did testify that at the time the quitclaim deed was executed on June 21, 1963 he had no plan to be married.

This testimony is vague, indefinite, self-contradictory, incredible in some respects, and demonstrates feelings and attitudes towards the Polittes following Craft's last marriage which run counter to and are incongruous with the paternalistic generosity which characterized Craft's dealings with the Polittes during the previous 25 years of their relationship. Craft's disenchantment with the Polittes, finally culminating in this litigation, dated from and we are convinced was a by-product of his third marriage. We do not consider that his drifting away from the Polittes was the result of the failure of the latter to abide by the terms of Craft's version of the agreement, as plaintiffs suggest. Craft's inability to remember the execution of the deed to the Polittes, by which he yielded up all claims to the property—an act performed at Craft's instigation in Craft's lawyer's office—is incredible. Craft's mind was clear and his memory seemed to be good on all other subjects and he was able to testify with particularity with respect to other much less significant details, but he claimed to have no recollection whatever of this solemn act, which went to the very heart of the matter. Craft's professed inability to recollect the event of the deed casts doubt upon the whole of his testimony.

 Plaintiff's basic claim on this appeal is that they are entitled to have an equitable lien impressed upon the property. "[T]he creation of an equitable lien contemplates a debt or obligation combined with an intention, express or implied, to appropriate certain property as security for the payment of the debt or obligation." Wilkinson v. Tarwater, Mo.Sup., 393 S.W.2d 538, 542 [5]. See also Pine Lawn Bank and Trust Company v. Urbahns, Mo.App., 417 S.W.2d 113, 117 [6]. Neither a debt nor an agreement or intention that the property be appropriated as security for a debt having been shown, no equitable lien could properly be impressed upon this property.

The decree was not clearly erroneous but reached the right result under the facts of this case. This dispenses with the necessity of inquiring into the validity of the other defenses interposed, and plaintiffs' suggestion (first advanced in their reply brief) that defendants are relying upon the existence of a private annuity contract without having properly proved the existence of such a contract.

WELBORN and HIGGINS, CC, concur.

The decree is affirmed.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., HOLMAN, J., and HENLEY, Alternate Judge, concur.

BARDGETT, J., not participating because not a member of the court when case was submitted.